Jonas B. Jacobson (Cal. Bar No. 269912)
jonas@dovel.com
Simon Franzini (Cal. Bar No. 287631)
simon@dovel.com
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Hope Murphy, Carol Lesh, and Emily Jiang, individually and on behalf of all others similarly situated, | Case No. 3:22-cv-03760-CRB |
| *Plaintiffs*, | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| Olly Public Benefit Corporation, | |
| *Defendant*. | |

**Table of Contents**

I.    Introduction. ................................................................................................. 1

II.   Parties. ........................................................................................................... 2

III.  Jurisdiction, venue, and divisional assignment. ........................................... 2

IV.   Facts. .............................................................................................................. 2

    A.   It is important to consumers that over-the-counter melatonin is accurately dosed and labeled. ...................................................................................... 2

    B.   The FDA does not allow melatonin to be excessively overdosed. ................ 5

    C.   Scientific research reveals serious problems with the accuracy of melatonin dosing and labelling in Canada.  Scientists warn that the same is likely true of some U.S. brands. ................................................................................... 6

    D.   Olly sells over-the-counter melatonin supplements to millions of U.S. consumers.  Each label claims to have a specific amount of melatonin per serving. ..................................................................................................... 7

    E.   Scientific testing reveals that, unlike other manufacturers, Olly Melatonin has an unreasonable excess of melatonin. ......................................................... 9

    F.   Olly's labelling is false and misleading to reasonable consumers. ............... 11

    G.   Olly overcharges millions of consumers. ..................................................... 13

    H.   Plaintiffs were misled and harmed by Olly's misleading labelling. ............. 14

    I.    Plaintiffs have standing to seek an injunction. ............................................ 15

    J.    Plaintiffs have no adequate remedy at law. .................................................. 15

V.    Class action allegations. ................................................................................ 17

VI.   Claims. ........................................................................................................... 19

    Count 1: Violations of State Consumer Protection Acts ................................... 19

    Count 2: Violation of California's Unfair Competition Law (UCL) .................. 20

    Count 3: Violation of California's False Advertising Law (FAL) ...................... 21

    Count 4: Violation of the California Consumers Legal Remedies Act (CLRA) ......... 22

    Count 5: Violation of New York Gen. Bus. Law § 349 ...................................... 23

    Count 6: Violation of New York Gen. Bus. Law § 350 ...................................... 24

    Count 7: Breach of Express Warranty ............................................................... 24

    Count 8: Unjust Enrichment/Quasi-Contract .................................................... 25

VII.  Jury Demand. ................................................................................................. 25

VIII. Prayer for Relief. ........................................................................................... 25

## I.    Introduction.

1.    Melatonin is a neurohormone that regulates the brain's sleep cycle.  Millions of consumers take over-the-counter melatonin supplements to help them sleep.  Because melatonin alters brain chemistry, it is important that these supplements are accurately dosed and labelled.

2.    A few years ago, scientists tested Canadian melatonin supplements and found that, for a number of brands, the true amount of melatonin varied wildly from the label.  Scientists and the National Institutes of Health have warned that the same may be true here in the U.S.

3.    Olly is a major U.S. brand of melatonin supplements.  Its supplements are sold nationwide at retailers like Walmart, Whole Foods, and Target.

4.    Each Olly bottle claims to have a specific dose of melatonin per serving.  For example:



5.    Like millions of other consumers, Plaintiffs bought Olly melatonin and trusted the accuracy of Olly's dosing and labelling.

6.    To determine how much melatonin is really in Olly, a university mass-spectrometry laboratory tested multiple bottles of Olly, including Plaintiffs' bottles. The results were alarming. The true amount of melatonin in Plaintiffs' bottles was 165% to 274% of the amount claimed.  All tested bottles had far more melatonin than the amount on the label (and far more melatonin than the "reasonable excess" permitted by the FDA).

7.    Olly systematically misrepresents how much melatonin is in the supplements it sells. Consumers are being misled, overcharged, and put at risk.

1   **II.     Parties.**

2          8.      Plaintiff Hope Murphy is domiciled in Vista, California.  She purchased a bottle of

3   Olly Sleep in California.

4          9.      Plaintiff Carol Lesh is domiciled in Berkeley, California.  She purchased a bottle of

5   Olly Sleep Extra Strength in California.

6          10.     Plaintiff Emily Jiang is domiciled in Manhattan, New York.  They purchased a bottle

7   of Olly Sleep in New York. [1]

8          11.     The proposed class includes citizens of every state.

9          12.     Defendant Olly Public Benefit Corporation is a Delaware corporation with its

10  principal place of business in San Francisco, California.

11  **III.    Jurisdiction, venue, and divisional assignment.**

12         13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2).  The amount

13  in controversy exceeds $5,000,000, exclusive of interest and costs, and the matter is a class action in

14  which one or more members of the proposed class are citizens of a state different from Olly.

15         14.     The Court has personal jurisdiction over Olly because (among other reasons) its

16  principal place of business is in California.

17         15.     Venue is proper under 28 U.S.C. § 1391(b)(1) because Olly resides in this District, at

18  its San Francisco headquarters.

19         16.     <u>Divisional Assignment</u>.  This case should be assigned to the San Francisco or Oakland

20  division.  *See* L.R. 3-2(d).  A substantial part of the events giving rise to the claims occurred in San

21  Francisco, at Olly's headquarters.

22  **IV.     Facts.**

23         **A.      It is important to consumers that over-the-counter melatonin is accurately dosed**

24                  **and labeled.**

25         17.     Melatonin (N-acetyl-5-methoxytryptamine) is a neurohormone produced by the pineal

26  gland in the brain.  It regulates the brain's circadian rhythm and sleep cycle.

27

28  _____

         [1] Emily Jiang's pronouns are they/them.

*The chemical structure of melatonin*

18.     Millions of U.S. consumers take melatonin supplements to treat sleep problems, anxiety, and other issues.  Melatonin is one of the most popular over-the-counter supplements in the U.S.  Its use has "significantly increased" in the last 20 years. [2]  Using melatonin to help children fall asleep is becoming increasingly popular too. [3]

19.     As scientists explained in the Journal of Clinical Sleep Medicine, because melatonin is "self-prescribed" (i.e., purchased directly by consumers who are not experts), it is particularly "important that labels are informative and representative of the product," i.e., that the "label claim values for the active ingredient are accurate." [4]

20.     In particular, it is important to consumers that melatonin is not excessively dosed, compared to what is represented on the label.  The likelihood of side effects from melatonin increases with the dosage.  Side effects of melatonin include headaches, dizziness, nausea, or excessive or unwanted sleepiness. [5]  As the Texas Health hospital network explains, a "lower dose" will reduce the risk of "side effects" and thus "using the lowest effective dose will give you the best outcomes while keeping any undesirable side effects at bay." [6] And as another major manufacturer of melatonin

---

[2] JAMA Research Letter, *Trends in Use of Melatonin Supplements Among US Adults*, 1999-2018, 327(5) JAMA 483 (2022).

[3] The New York Times, *Parents Are Relying on Melatonin to Help Their Kids Sleep. Should They?*, https://www.nytimes.com/2020/05/18/parenting/melatonin-sleep-kids.html

[4] Erland, L. & Saxena, P., *Melatonin Natural Health Products and supplements: Presence of serotonin and significant variability of melatonin content*, 13 Journal of Clinical Sleep Medicine 275–281 (2017).

[5] NIH National Library of Medicine Medline Plus, *Melatonin*, https://medlineplus.gov/druginfo/natural/940.html

[6] https://www.texashealth.org/areyouawellbeing/Health-and-Well-Being/Is-It-Safe-to-Take-Melatonin-Every-Night

supplements states: "The likelihood of these side effects [headaches, upset stomach, grogginess, sleeplessness, irritability and dizziness] increases with the dosage." [7] This is why "[m]any experts recommend starting with the smallest available dosage — 0.5 milligrams to 1 milligram." [8]

21.     When melatonin is falsely labeled, consumers unwittingly take "higher doses" that increase the risk of "unpleasant/unexpected side effects." [9]  And regardless of side effects, consumers don't want to unwittingly take excessive amounts of a neurohormone that alters brain chemistry. Consumers deserve the right to make an informed choice about how much melatonin they are really taking.

22.     In addition, it is important to consumers that melatonin is accurately (not excessively) dosed because the long-term safety of melatonin is not established, and higher doses carry greater long-term safety concerns. As the National Institutes of Health explains, the long-term safety of melatonin remains unknown:

> For melatonin supplements, particularly at doses higher than what the body
> normally produces, there's not enough information yet about possible side
> effects to have a clear picture of overall safety. Short-term use of melatonin
> supplements appears to be safe for most people, but information on the long-
> term safety of supplementing with melatonin is lacking.[10]

23.     Melatonin is available on the market in a range of doses, e.g., 1 mg, 3 mg, 5 mg or 10 mg.  This is because consumers want to make their own, informed decision about the dosage that is right for them.  No consumer wants this choice to be robbed from them by inaccurate labelling and dosing.  For example, if a consumer purchases a 3 mg dose (and not a higher dose), this is because they want 3 mg and no more. This choice is objectively reflected by their decision to purchase 3 mg, instead of a higher dose. This consumer does not want to be tricked into taking, for example, 6 mg, when they thought they were purchasing and taking 3 mg.

---

[7] https://www.zzzquil.com/en-us/faq/zzzquil-pure-zzzs-melatonin-faq  (made by Proctor & Gamble)
[8] The New York Times, *Melatonin Isn't a Sleeping Pill. Here's How to Use It*, https://www.nytimes.com/2022/01/11/well/mind/melatonin-sleep-insomnia.html
[9] Grigg-Damberger, M. & Ianakieva, D., Poor quality control of over-the-counter melatonin: What they say is often not what you get, 13 Journal of Clinical Sleep Medicine 163–165 (2017).
[10] https://www.nccih.nih.gov/health/melatonin-what-you-need-to-know

24.     To be sure, a different consumer may choose and purchase a higher dose (5 mg). But that is the point: because melatonin is a neurohormone and higher doses come with higher risks and greater safety concerns, each consumer has the right to make their own, informed choice about what dosage to purchase.  No reasonable consumer wants to be tricked into taking a higher dose than they wanted.

**B.     The FDA does not allow melatonin to be excessively overdosed.**

25.     The FDA recognizes that consumers have a right to make an informed decision about how much of supplements, like melatonin, they are really taking.  The FDA also recognizes that some supplements, such as melatonin, degrade over time, such that a product that contains a certain amount of a supplement when it is put on the shelves might have less of that supplement at expiration.

26.     The FDA balanced these competing considerations by providing that, for dietary supplements "reasonable excesses over labeled amounts are acceptable within current good manufacturing practice," 21 C.F.R §101.36(f)(1), i.e., within amounts reasonably necessary to ensure that the product "meets the amount specified on the label throughout the product's shelf life." Current Good Manufacturing Practice in Manufacturing, Packaging, Labeling, or Holding Operations for Dietary Supplements, 72 Fed. Reg. 34752, 34884 (June 25, 2007). But, as the FDA provides, manufacturers are prohibited from adding "unspecified amounts [of an ingredient] that would be in excess of the amount actually needed to meet the label declaration." 68 Fed. Reg. 12158, 12158 (Mar. 13, 2003).  So, an excess is not a "reasonable excess" (and violates FDA regulations) if the excess is materially in excess of the amount actually needed to meet the amount declared on the label throughout the product's shelf life.

27.     The FDA does not review and approve any particular overages for dietary supplements—the duty falls on manufacturers to assure compliance with the "reasonable excess" limit.

28.     Certain U.S. manufacturers comply with the FDA's limits.  For context, Plaintiffs' testing has shown that melatonin by other U.S. manufacturers who do not unreasonably overdose their products is put on shelves with an excess amounting to approximately 10-15% more than the amount declared on the label.  This excess is reasonable because, by the time the shelf life ends, the

product has approximately the amount of melatonin that is declared on the label. In this situation, the excess is not materially in excess of the amount actually needed to meet the label declaration, and so it complies with the FDA's mandates.

29.     By contrast, if a manufacturer includes materially more melatonin than is actually needed to ensure that by the time the shelf life ends, the product has approximately the amount of melatonin that is declared on the label, this violates FDA's mandates.  Because such an excess is more than the amount actually needed to meet the label declaration, it is not a "reasonable" excess.  It is therefore not permitted under the FDA regulations (and is instead prohibited).

C.     **Scientific research reveals serious problems with the accuracy of melatonin dosing and labelling in Canada.  Scientists warn that the same is likely true of some U.S. brands.**

30.     In 2017, a study of Canadian melatonin brands found "high variability, ranging from −83% to +478%, of the labelled concentration of melatonin content in melatonin supplements." [11] Some brands had reasonable excesses that were within 10% of the listed amount. But for over 70% of the tested brands, the true amount of melatonin varied more than 10% from the listed amount.  The amount of melatonin also varied highly between different lots (manufacturing batches) of the same product.  The researchers concluded that "manufacturers require increased controls to ensure melatonin supplements" are accurately labelled.

31.     U.S. scientists warned that this Canadian study "herald[s] what may also be true in OTC melatonin supplements marketed in the United States." [12]  Likewise, the National Institutes of Health has warned that "some melatonin supplements may not contain what's listed on the product label." [13]  And Consumer Reports warned: "The findings … offer the latest proof of something

---

[11] Lauren, *Melatonin Natural Health Products and supplements*, 13 Journal of Clinical Sleep Medicine at 276.
[12] Grigg-Damberger, *Poor quality control of over-the-counter melatonin*, 13 Journal of Clinical Sleep Medicine at 163.
[13] NIH National Center for Complementary and Integrative Health, *Melatonin: What You Need To Know*,  https://www.nccih.nih.gov/health/melatonin-what-you-need-to-know

supplement industry critics have long warned about: When it comes to this poorly regulated corner of modern medicine, consumers often don't know what they're buying." [14]

    **D.**    **Olly sells over-the-counter melatonin supplements to millions of U.S. consumers. Each label claims to have a specific amount of melatonin per serving.**

32.    Olly is a major U.S. brand of melatonin supplements. Its melatonin products ("Olly Melatonin") are available nationwide at retailers like Walmart, Target, and Whole Foods. Millions of U.S. consumers buy Olly Melatonin and rely on the accuracy of its labelling.

33.    Olly makes and sells several varieties of Olly Melatonin, including: Olly Sleep (regular, Extra Strength, and Ultra Strength), Immunity Sleep, Muscle Recovery Sleep, and Kids Sleep. For each product, the label claims a specific amount of melatonin per serving, e.g., 3 mg or 5 mg, on the back label. Example products are shown below. *See* Exhibit 1 (additional Olly Melatonin labels).



---

[14] Consumer Reports, *New Study Questions Ingredient Levels in Some Melatonin Supplements*, https://www.consumerreports.org/melatonin/study-questions-ingredient-levels-some-melatonin-supplements/



34.     These claims on the back of the product are substantially similar for all Olly products. They all advertise "melatonin" as a key, active ingredient to help with sleep, and claim to have a specific amount of melatonin per serving. *See* Exhibit 1.

35.     Also, for some products (like the one purchased by Plaintiff Lesh), Olly displays the claimed amount of melatonin on the front of the packaging (in addition to the back).  For example:



36.     These front-facing representations (e.g., of "5 mg" or "10 mg") are substantially similar for all Olly products that have them (identified in Exhibit 1: Olly Sleep Extra Strength 5mg and Olly Sleep Ultra Strength 10 mg).

37.     Each Plaintiff and each class member was presented with the materially-identical representation on the back of all products, and, where identified, the materially-identical representation on the front of the products.

38.     By selling a "melatonin" supplement for sleep (i.e., a supplement that alters brain chemistry), Olly is representing to consumers that its products are accurately dosed and labelled. When a consumer picks up a bottle of Olly Melatonin, they reasonably expect that it actually has the dosage for which Olly designed the recommended serving.  No reasonable consumer expects that a melatonin supplement has an unreasonable excess of melatonin, compared to what it is supposed to have. And specifically, when a bottle of Olly says it has a particular amount of melatonin per serving (e.g., 3 mg), consumers expect this to be accurate (and not unreasonably excessive).

**E.      Scientific testing reveals that, unlike other manufacturers, Olly Melatonin has an unreasonable excess of melatonin.**

39.     Liquid Chromatography-Mass Spectrometry analysis (LC-MS) can accurately measure the true amount of melatonin in an over-the-counter supplement.  LC-MS is a reliable and appropriate analytical procedure for measuring melatonin content.

40.     For Olly Melatonin, a university mass-spectrometry laboratory used LC-MS to test Olly Melatonin (including Plaintiffs' bottles), among other brands.  The lab tested both non-expired bottles and expired bottles, from different manufacturing lots (batches).

41.     If Olly Melatonin were reasonably dosed, the amount of melatonin at the end of the shelf life (when the bottle expires) would be materially the same as the claim on the label, i.e., close to 100% of the claimed amount.  In contrast, if Olly has an unreasonable excess of melatonin, even after a bottle expires (i.e., its shelf life is over) there will be materially more melatonin than the amount specified on the label.  The test results, summarized on the next page, confirm that Olly has an unreasonable excess of melatonin.

| Olly type [15] | Claimed melatonin (mg / gummy)[16] | True melatonin (mg / gummy)[17] | True melatonin (%)[18] |
|---|---|---|---|
| **Non-expired bottles** | | | |
| Sleep (Hope Murphy) Lot: 1300M5735 Exp: 2/2023 Tested: 5/2022 | 1.50 | 4.11 | +274% |
| Sleep (Emily Jiang) Lot: 1295M9300 Exp: 3/2023 Tested: 5/2022 | 1.50 | 2.47 | +165% |
| Immunity Sleep Lot: 1284M9209 Exp: 3/2023 Tested: 3/2022 | 1.50 | 2.48 | +165% |
| Extra Strength (Carol Lesh) Lot: 1246D5716 Exp: 1/2023 Tested: 4/2022 | 2.50 | 4.77 | +190% |
| **Expired bottles** | | | |
| Olly Sleep Ultra Softgel Lot: 303012 Exp: 10/2022 Tested: 9/2022 | 3.0 | 5.12 | +170% |
| Olly Sleep Lot: 1031155 Exp: 07/2022 Tested: 08/2022 | 1.50 | 2.00 | +133% |
| Olly Muscle Recovery Sleep Lot: 1158M 1098 Exp: 10/2022 Tested: 9/2022 | 1.50 | 2.28 | +152% |
| Olly Kid's Sleep Lot: 1144M 1106 Exp: 10/2022 Tested: 9/2022 | 0.5 | 0.63 | +125% |

---

[15] "Lot" is the lot number printed on bottle.  "Exp" is the expiration date printed on bottle. "Tested" is the month the lab conducted the test.

[16] The serving size for each bottle is 2 gummies/serving.  Accordingly, the per-gummy claimed amount of melatonin is half the per-serving claimed amount.

[17] The lab tested three gummies per bottle and averaged the results. There was little variance in the melatonin content between gummies in the same bottle.

[18] The percentage ratio of the true dose to the claimed dose.

42.     These results show that the melatonin content of non-expired Olly is far higher than the claimed dosages. For example, the bottle of Olly Sleep had nearly three times the amount of melatonin listed on the label, and the bottle of Olly Extra Strength had nearly twice the amount of listed melatonin.   Unsurprisingly, once Olly Melatonin expires, there is still far too much melatonin, compared to the amount claimed on the label.[19]  Because the excess is materially more than reasonably necessary to ensure that the melatonin meets the amount specified on the product label throughout the product's shelf life, Olly Melatonin is unreasonably overdosed.

43.     Olly's own data will confirm that Olly's melatonin products have an unreasonable excess of melatonin.  Supplement manufacturers are required to test the dietary supplements they sell for compliance with the FDA's regulations.  That testing must be performed using a random 12-sample composite method.  21 C.F.R. § 101.9(g)(2) (describing this method).  Manufacturers like Olly must retain the data from these tests.  As shown above, in Plaintiffs' testing, *all* of the Olly samples were substantially overdosed.  This was true across lots, within and across product types, and across expiration dates. Accordingly, it is reasonable to infer that Olly's own testing (using FDA protocols) will confirm that the products are substantially (and unreasonably) overdosed.[20]

**F.     Olly's labelling is false and misleading to reasonable consumers.**

44.     As detailed above, each Olly Melatonin label claims to have a specific amount of melatonin per serving. But in truth, the dosing is unreasonably excessive.  In this way, Olly's affirmative representations are misleading to reasonable consumers.

45.     For each type of Olly Melatonin, the label is false in the same way.  As illustrated above (and shown in Exhibit 1), each label claims to have a specific amount of melatonin. And for each type of Olly Melatonin, the true amount of melatonin is unreasonably excessive, compared to the claimed amount.

46.     For the injury alleged here, what matters is the accuracy of the claimed melatonin dosage.  And in this respect, all Olly Melatonin is substantially the same: it is all unreasonably overdosed. There are, of course, immaterial differences in the products.  For example, Olly Sleep

---

[19] The expired bottles were tested either after the expiration month, or the week before the expiration month.

[20] At this early stage, Olly's own testing is uniquely within its own possession.

comes in two different flavors: Blackberry and Strawberry.  But the claimed dosing does not differ between these flavors and the flavoring has no impact on dosing.

47.     As also detailed above, the inaccurate dosing and labelling of Olly Melatonin is material to reasonable consumers.  Consumers need melatonin supplements to be accurately dosed and labelled, so that consumers can make an informed choice about what dosage to buy and ingest. No reasonable consumer wants to unwittingly buy and ingest a supplement containing an unreasonable excess of melatonin, compared to what they wanted to ingest.

48.     Olly itself recognizes that accurate dosing and labelling is important to its consumers. Olly's website claims that its products are "ensured with quality and safety," and that "every product is made to meet our formulators specifications for identity, purity and potency to ensure they meet what their label claims." [21]  The point is not that all consumes read the website—the point is that Olly itself admits that accurate dosing and labelling is material to reasonable consumers.  Olly make this claim because it recognizes that consumers want this to be true, i.e., consumers demand products that are accurately labelled and dosed.  But for Olly's products, this is not true.

49.     In addition, each bottle of Olly states: "We do not recommend exceeding the amount noted on every bottle's Suggested Use.  Each product was formulated by nutritional experts to deliver an effective dose of active ingredients that address daily needs and promote optimum health." [22]  Olly recognizes that a consumer who chooses to purchase say, a 5 mg bottle of melatonin (and thus selects that particular tradeoff between dosage and risk), should not be unwittingly ingesting, say, nearly twice that amount.  But due to Olly's inaccurate labelling and excessive dosing, Olly's consumers are unwittingly doing what Olly recommends against.

50.     As described above, Olly claims that it actively monitors the "potency" of "every product."  And it is customary for manufacturers to test the potency of over-the-counter supplements like melatonin, before they are sold.  Therefore, Olly reasonably should have known that the potency of Olly Melatonin is unreasonably excessive, compared to its labels. [23]

---

[21] https://www.olly.com/pages/inside-the-product
[22] https://help.olly.com/hc/en-us/articles/360035074332-Can-I-take-more-than-the-recommended-dose-
[23] At this stage, Plaintiffs are not alleging intentional deception or fraud, but reserve the right to amend if discovery reveals evidence of Olly's fraudulent intent.

51.     To be clear, while Olly's unreasonably excessive dosing violates the FDC Act, Plaintiffs are not seeking to enforce the FDC Act itself (i.e., Plaintiffs are not suing merely because the conduct violates the Act).  Olly's false and misleading labeling (and unreasonably excessive dosing) is independently illegal under state consumer protection and warranty laws. It is these state laws that Plaintiffs assert.

52.     Nor are Plaintiffs seeking to impose disclosure requirements not required by the FDA. Plaintiffs want Olly to fix its dosing so that it is reasonable (instead of unreasonably excessive) and so that its labels are not misleading.  This is identical to what the FDC Act and FDA require.

**G.     Olly overcharges millions of consumers.**

53.     Olly's false and misleading labelling drives the demand for Olly Melatonin.  As explained above, consumers demand melatonin that is accurately dosed and labelled.  This is recognized by scientists, Consumer Reports, and Olly itself.  If consumers knew the truth—that its dosing and labelling was seriously inaccurate—the price of its products would crater.  For example, on the Target website, a bottle of Olly Sleep costs $12.89.  If consumers knew the truth—that this bottle was inaccurately labelled and unreasonably overdosed—Olly could not sell it for anything close to $12.89 (or even sell it at all).  For example, a reasonable consumer who wanted to buy a product with 3 mg of melatonin would not buy an unreasonably overdosed and inaccurately labelled product, and would instead buy a reasonably dosed and accurately labeled product.  Plaintiffs and each class member paid a substantial price premium driven by Olly's false and misleading labelling.

54.     In fact, without accurate dosing and labelling, Olly Melatonin is worthless.  What reasonable consumer wants to buy a supplement that alters brain chemistry, if the product is inaccurately labelled and unreasonably overdosed?  Every reasonable consumer would instead buy an accurately dosed and labelled product, so that they could trust what they are getting.  Plaintiffs and each class member paid for Olly Melatonin products that are, in truth, worthless.  Thus, the full economic injury here is the entire price of the Olly Melatonin that Plaintiffs and class members purchased.

1

**H.      Plaintiffs were misled and harmed by Olly's misleading labelling.**

2

55.      Like millions of other consumers, Plaintiffs bought Olly Melatonin and relied on the

3

accuracy of Olly's dosing and labelling.

4

56.      In or around fall 2021, Carol Lesh bought a bottle of Olly Sleep Extra Strength (Lot

5

#1246D5716) from a Whole Foods in Berkeley, California.  Because she was buying a melatonin

6

supplement that could alter brain chemistry, she relied on the fact that Olly's dosages were well-

7

controlled (i.e., that the actual dosage would match the recommended dosages).  She read and relied

8

on the accuracy of the melatonin content on the label (including the claimed dosage per serving on

9

the front and back label), when buying the product and deciding to take it.  She selected and

10

purchased a 5 mg dose (and not a higher claimed dose) because she did not want to take more than 5

11

mg of melatonin from the product, due to increased concerns about side effects and safety.  In other

12

words, she chose not to purchase a higher dose because she did not want a higher dose.  While taking

13

the Olly product, she experienced unwanted daytime grogginess.  These effects went away when she

14

stopped taking it.  She would not have purchased the product if she knew that Olly Melatonin was

15

inaccurately labelled and unreasonably overdosed. In fact, knowing the truth, the product is worthless

16

to her.

17

57.      In or around fall 2021, Emily Jiang bought a bottle of Olly Sleep (Lot #1295M9300)

18

from a Target in Clinton, New York.  Because they were buying a melatonin supplement that could

19

alter brain chemistry, they relied on the fact that Olly's dosages were well-controlled (i.e., that the

20

actual dosage would match the recommended dosages).  They read and relied on the accuracy of the

21

melatonin content on the label (including the claimed dosage per serving), when buying the product

22

and deciding to take it.  Because their psychiatrist recommended 5-6 mg (and no more) they wanted

23

to purchase a product where two servings would be 6 mg (and no more). Specifically, for them

24

melatonin causes abnormally intense dreaming and associated sleep disruption, which is exacerbated

25

at higher doses. They did not want to take more than 6 mg of melatonin from the product, due to

26

increased concerns about side effects and safety.  In other words, they chose not to purchase a higher

27

dose because they did not want a higher dose. They would not have purchased the product if they

28

knew that Olly Melatonin was inaccurately labelled and unreasonably overdosed. In fact, knowing the truth, the product is worthless to them.

58.     In or around March 2022, Hope Murphy purchased a bottle of Olly Sleep (Lot #1300M5735) from either a Walmart or Winco in Oceanside, California.  Because she was buying a melatonin supplement that could alter brain chemistry, she relied on the fact that Olly's dosages were well-controlled (i.e., that the actual dosage would match the recommended dosages).  She read and relied on the accuracy of the melatonin content on the label (including the claimed dosage per serving), when buying the product and deciding to take it.  She selected and purchased a 3 mg dose (and not a higher claimed dose) because she did not want to take more than 3 mg of melatonin from the product, due to increased concerns about side effects and safety. In other words, she chose not to purchase a higher dose because she did not want a higher dose. She would not have purchased the product if she knew that Olly Melatonin was inaccurately labelled and unreasonably overdosed. In fact, knowing the truth, the product is worthless to her.

**I.     Plaintiffs have standing to seek an injunction.**

59.     Plaintiffs want Olly to fix its manufacturing practices and sell its melatonin products with accurate dosing and labelling.  If Olly fixes its products, so that they are accurately dosed and labelled, Plaintiffs intend to buy them and would buy them again.  But given Olly's past deception, Plaintiffs cannot rely on Olly's word alone that it has fixed the problem.  Plaintiffs face an imminent threat of harm because they will not be able to rely on Olly's labels in the future, and will not be able to buy Olly Melatonin, even if Olly claims to have fixed the issue.  To buy Olly products again, Plaintiffs need the Court to enter an order forbidding Olly from selling its melatonin unless it has fixed the dosing and labelling problem.  With that Court order in hand, Plaintiffs could and would buy Olly Melatonin again.  And with that order in hand, millions of other consumers will be protected from being deceived like Plaintiffs were deceived.

**J.     Plaintiffs have no adequate remedy at law.**

60.     As described above, Plaintiffs suffer an actual and imminent threat of future harm that cannot be cured with monetary damages.  For this harm, Plaintiffs lack an adequate remedy at law and require injunctive relief.

61.     Plaintiffs also seek damages and, in the alternative, equitable restitution.  Plaintiffs seek restitution in the alternative because they have no adequate remedy at law.

62.     A legal remedy is not adequate if it is not as certain as an equitable remedy.  To obtain a full refund as damages, Plaintiffs must show that the products they received have essentially no market value.  In contrast, Plaintiffs can seek restitution without making this showing.  This is because Plaintiffs purchased products that they would not otherwise have purchased, but for Olly's misrepresentations.  Obtaining a full refund at law is less certain that obtaining a refund in equity.

63.     Also, winning damages under the CLRA requires additional showings not required under the UCL and FAL.  For example, to obtain damages under the CLRA, Plaintiffs must prove that they complied with the CLRA's notice requirement.  This is significant, because here Olly contests Plaintiffs' compliance with CLRA notice requirements.  No such requirements exist to obtain restitution under the UCL.  In addition, the CLRA prohibits only particular categories of deceptive conduct.  By contrast, the UCL broadly prohibits "unfair" conduct and is thus broader.  Also, Plaintiffs UCL "unlawful" prong claims incorporate Olly's violation of the California Sherman Act.  This particular theory is not available for Plaintiffs' legal claims and, in material respects, is easier to prove. In addition, the statute of limitations is longer for Plaintiffs' UCL claims (4 years), compared to the statute of limitations for damages under the CLRA (3 years).

64.     By the same token, Plaintiff's common law claims require additional showings, compared to their UCL, FAL, or unjust enrichment claims.  For example, to prevail on their breach of warranty claim, Plaintiffs need to show that the statements they challenge constitute a warranty and that the warranty was part of the basis of the bargain.  No such showings are required by the UCL or FAL, or for an unjust enrichment theory.  In fact, the UCL and the FAL were enacted specifically to create new claims and remedies not available at common law.  And unjust enrichment exists in part because contractual claims are often more difficult to establish.  In this way, Plaintiffs' UCL and FAL claims, and Plaintiffs' unjust enrichment claims, are more certain than their legal claims.

65.     Finally, the remedies at law available to Plaintiffs are not equally prompt or otherwise efficient.  The need to schedule a jury trial may result in delay.  And a jury trial will take longer, and be more expensive, than a bench trial.

**V.     Class action allegations.**

66.     Plaintiffs bring their claims individually and on behalf of the following class and subclasses:

| Class or Subclass Name | Definition | Class representative(s) |
| --- | --- | --- |
| Nationwide Class | All persons who purchased Olly Melatonin in the United States during the applicable statute of limitations. | All Plaintiffs |
| Multi-State Consumer Protection Subclass | All persons who purchased Olly Melatonin in the identified states (*see* Count 1) during the applicable statute of limitations. | All Plaintiffs |
| California Subclass | All persons who purchased Olly Melatonin in California during the applicable statute of limitations. | Carol Lesh and Hope Murphy (CA) |
| New York Subclass | All persons who purchased Olly Melatonin in New York during the applicable statute of limitations. | Emily Jiang (NY) |

67.     The following people are excluded from the class and the subclasses: (1) any Judge or Magistrate Judge presiding over this action and the members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel, and their experts and consultants; and (6) the legal representatives, successors, and assignees of any excluded persons.

*Numerosity*

68.     The proposed class contains members so numerous that separate joinder of each member of the class is impractical. There are millions of proposed class members.

*Commonality*

69.     There are questions of law and fact common to the proposed class.  Common questions of law and fact include, without limitation:

- Whether Olly Melatonin products are reasonably dosed and accurately labelled;
- Whether Olly's labelling is misleading to reasonable consumers;
- Whether Olly violated state consumer protection laws;
- The monetary relief needed to reasonably compensate Plaintiffs and the proposed class;
- The injunctive relief needed to prevent future harm to Plaintiffs and the proposed class.

***Typicality***

70.     Plaintiffs' claims are typical of the proposed class.  Like the proposed class, Plaintiffs purchased Olly Melatonin.

***Predominance and Superiority***

71.     The prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent or varying adjudication with respect to individual members, which would establish incompatible standards for the parties opposing the class. For example, individual adjudication would create a risk that Olly Melatonin labelling is found to be misleading for some consumers, but not other similarly-situated consumers.

72.     Common questions of law and fact predominate over any questions affecting only individual members of the proposed class. These common legal and factual questions arise from central issues which do not vary from class member to class member, and which may be determined without reference to the individual circumstances of any particular class member. For example, a core liability question is common: whether Olly's labelling is misleading to reasonable consumers.

73.     A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical.  It would be unduly burdensome to separately litigate millions of individual claims.

***Classwide injunctive relief***

74.     Olly has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole.

# VI.    Claims.

## Count 1: Violations of State Consumer Protection Acts

### (on behalf of all Plaintiffs and the Multi-State Consumer Protection Subclass)

75.    Plaintiffs incorporate each and every factual allegation set forth above.

76.    As alleged below, Plaintiffs bring individual and subclass claims based on California law.  For the Multi-State Consumer Protection Subclass, Plaintiffs bring this count for violations of state consumer protection laws that are materially-similar to the laws of California, including:

| State | Statute |
|-------|---------|
| California | Cal. Bus. & Prof. Code § 17200, and the following; *Id.* §17500, and the following; Cal. Civ. Code §1750 and the following. |
| Connecticut | Conn. Gen Stat. Ann. § 42- 110, and the following. |
| Illinois | 815 ILCS § 501/1, and the following. |
| Maryland | Md. Code Ann. Com. Law, § 13-301, and the following. |
| Missouri | Mo. Rev. Stat. § 407, and the following. |
| New York | N.Y. Gen. Bus. Law § 349, and the following. |

77.    Each of these statutes is materially similar.  Each broadly prohibits deceptive conduct in connection with the sale of goods to consumers.  No state requires individualized reliance, or proof of defendant's knowledge or intent.  Instead, it is sufficient that the deceptive conduct is misleading to reasonable consumers and that the conduct proximately caused harm.

78.    As alleged in detail above, Olly's misrepresentations are misleading to reasonable consumers in a material way.  Olly's false and misleading labelling was a substantial factor in Plaintiffs' purchase decisions and the purchase decisions of class members.

79.    Plaintiffs and class members were injured as a direct and proximate result of Olly's conduct because: (a) they would not have purchased Olly Melatonin if they had known that the Olly products are inaccurately labelled and unreasonably overdosed; (b) they overpaid for the products

because the products are sold at a price premium due to Olly's misleading labelling; or (c) they received products that were, in truth, worthless.

### Count 2: Violation of California's Unfair Competition Law (UCL)

**(on behalf of Plaintiffs Murphy and Lesh and the California Subclass)**

80.     Plaintiffs incorporate each and every factual allegation set forth above.

81.     Plaintiffs bring this cause of action individually and on behalf of the California Subclass.

82.     Olly has violated California's Unfair Competition Law (UCL) by engaging in unlawful, fraudulent, and unfair conduct (i.e., violating each of the three prongs of the UCL).

***The Unlawful Prong***

83.     Olly engaged in unlawful conduct by violating the FAL and CLRA, as alleged below and incorporated here.

84.     In addition, Olly engaged in unlawful conduct by violating California Health & Safety Code § 109875 et seq. (the Sherman Food Drug and Cosmetic Law) which adopts and parallels federal FDCA requirements, including prohibitions on false and misleading labeling.

***The Fraudulent Prong***

85.     As alleged in detail above, Olly's labelling is false and misleading.  Its labelling is likely to deceive, and did deceive, Plaintiffs and other reasonable consumers.

***The Unfair Prong***

86.     Olly's conduct, as detailed above, also violated the "unfair" prong of the UCL.

87.     Olly's conduct caused substantial injury to Plaintiffs and subclass members.  The harm to Plaintiffs and the subclass greatly outweighs the public utility of Defendant's conduct (which is none).  Inaccurately dosed and labelled melatonin supplements have no public utility.  This injury was not outweighed by any countervailing benefits to consumers or competition.  Misleading labels only injure healthy competition and harm consumers.

88.     Plaintiffs and the class could not have reasonably avoided this injury.  As alleged above, Olly's misrepresentations were deceptive to reasonable consumers.

89.     Defendant's conduct, as alleged above, was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers

90.     Defendant's conduct violated the public policy against false and misleading labels, which is tethered to the CLRA and FAL, as well as California's Sherman Act.

*   *   *

91.     For all prongs, Plaintiffs saw, read and reasonably relied on Olly's misrepresentations when purchasing Olly Melatonin.  Classwide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy Olly Melatonin.

92.     Olly's misrepresentations were a substantial factor in Plaintiffs' purchase decision and the purchase decisions of class members.

93.     Plaintiffs and class members were injured as a direct and proximate result of Olly's conduct because: (a) they would not have purchased Olly Melatonin if they had known that the Olly products are inaccurately labelled and unreasonably overdosed; (b) they overpaid for the products because the products are sold at a price premium due to Olly's misleading labelling; or (c) they received products that were, in truth, worthless.

**Count 3: Violation of California's False Advertising Law (FAL)**

**(on behalf of Plaintiffs Murphy and Lesh and the California Subclass)**

94.     Plaintiffs incorporate each and every factual allegation set forth above.

95.     Plaintiffs bring this cause of action individually and on behalf of the California subclass.

96.     As alleged in detail above, Olly falsely advertised its products by falsely representing that Olly Melatonin is accurately dosed and labelled.

97.     Defendant's misrepresentations were likely to deceive, and did deceive, Plaintiffs and other reasonable consumers.  Defendant should have known through the exercise of reasonable care that these statements were false and misleading.

98.     Plaintiffs saw, read and reasonably relied on Olly's misrepresentations when purchasing Olly Melatonin.  Classwide reliance can be inferred because Defendant's

misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy the products.

99.    Defendant's misrepresentations were a substantial factor in Plaintiffs' purchase decisions and the purchase decisions of subclass members.

100.    Plaintiffs and class members were injured as a direct and proximate result of Olly's conduct because: (a) they would not have purchased Olly Melatonin if they had known that the Olly products are inaccurately labelled and unreasonably overdosed; (b) they overpaid for the products because the products are sold at a price premium due to Olly's misleading labelling; or (c) they received products that were, in truth, worthless.

### Count 4: Violation of the California Consumers Legal Remedies Act (CLRA)
### (on behalf of Plaintiffs Murphy and Lesh and the California Subclass)

101.    Plaintiffs incorporate each and every factual allegation set forth above.

102.    Plaintiffs bring this cause of action individually and on behalf of the California Subclass.

103.    As alleged in detail above, Olly has violated the CLRA by falsely representing that Olly Melatonin is accurately dosed and labelled.  As a result of engaging in such conduct, Defendant has violated California Civil Code § 1770(a)(5), (a)(7), and (a)(9).

104.    Defendant's misrepresentations were likely to deceive, and did deceive, Plaintiffs and reasonable consumers.  Olly should have known through the exercise of reasonable care that these statements were false and misleading.

105.    Plaintiffs saw, read and reasonably relied on Defendant's misrepresentations when purchasing the products.  Classwide reliance can be inferred because Olly's misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy the products.

106.    Defendant's misrepresentations were a substantial factor and proximate cause in causing damages and losses to Plaintiffs and class members.

107.    Plaintiffs and class members were injured as a direct and proximate result of Olly's conduct because: (a) they would not have purchased Olly Melatonin if they had known that the Olly

products are inaccurately labelled and unreasonably overdosed; (b) they overpaid for the products because the products are sold at a price premium due to Olly's misleading labelling; or (c) they received products that were, in truth, worthless.

108.    CLRA § 1782 NOTICE.  On June 27, 2022, Plaintiffs Murphy and Lesh sent a CLRA demand letter to Olly's San Francisco headquarters and its California registered agent, via certified mail (return receipt requested).  This letter provided notice of the particular violations alleged here and demanded that Defendant correct the problem.  Defendant did not respond.  Accordingly, these Plaintiffs seek all monetary and equitable relief available under the CLRA, including reasonable attorney fees.

109.    Plaintiffs previously filed CLRA venue declarations.  Dkt. 17-3 and 17-4.

### Count 5: Violation of New York Gen. Bus. Law § 349

### (on behalf of Plaintiff Jiang and the New York Subclass)

110.    Plaintiff incorporates each and every factual allegation set forth above.

111.    Plaintiff brings this cause of action individually and for the New York Subclass, seeking statutory damages available under New York Gen. Bus. Law § 349 (among other relief).

112.    Plaintiff and the subclass purchased Olly Melatonin Products in New York.

113.    Olly's labelling is consumer-oriented and its misleading labelling has a broad impact on consumers at large, i.e., the multitude of New Yorkers that purchase Olly Melatonin.

114.    As alleged in detail above, Olly's misrepresentations are likely to mislead reasonable consumers acting reasonably under the circumstances.  These misrepresentations were material (and important) to consumers and drove their choice to purchase Olly Melatonin.

115.    Plaintiff and class members were injured as a direct and proximate result of Olly's conduct because: (a) they would not have purchased Olly Melatonin if they had known that the Olly products are inaccurately labelled and unreasonably overdosed; (b) they overpaid for the products because the products are sold at a price premium due to Olly's misleading labelling; or (c) they received products that were, in truth, worthless.

116.    Plaintiff and the subclass seek statutory damages of $50, treble damages, an injunction, reasonable attorney fees, and all other available relief.  See N.Y. Gen. Bus. Law § 349 (h).

## Count 6: Violation of New York Gen. Bus. Law § 350

### (on behalf of Plaintiff Jiang and the New York Subclass)

117.   Plaintiff incorporates each and every factual allegation set forth above.

118.   Plaintiff brings this cause of action individually and for the New York Subclass, seeking statutory damages available under New York Gen. Bus. Law § 350 (among other relief).

119.   Plaintiff and the subclass purchased Olly Melatonin Products in New York.

120.   Olly's labelling is consumer-oriented and its misleading labelling has a broad impact on consumers at large, i.e., the multitude of New Yorkers that purchase Olly Melatonin.

121.   As alleged in detail above, Olly's misrepresentations are likely to mislead reasonable consumers acting reasonably under the circumstances.  These misrepresentations were material (and important) to consumers and drove their choice to purchase Olly Melatonin.

122.   Plaintiff and class members were injured as a direct and proximate result of Olly's conduct because: (a) they would not have purchased Olly Melatonin if they had known that the Olly products are inaccurately labelled and unreasonably overdosed; (b) they overpaid for the products because the products are sold at a price premium due to Olly's misleading labelling; or (c) they received products that were, in truth, worthless.

123.   Plaintiff and the subclass seek statutory damages of $500, treble damages, an injunction, reasonable attorney fees, and all other available relief.  See N.Y. Gen. Bus. Law § 350-e (3).

## Count 7: Breach of Express Warranty

### (on behalf of Plaintiffs and the California and New York Subclasses)

124.   Plaintiffs incorporate by reference each and every factual allegation set forth above.

125.   Plaintiffs bring this count individually.  In addition, Plaintiffs Murphy and Lesh bring this claim on behalf of the California Subclass and Plaintiff Jiang brings this claim on behalf of the New York subclass.

126.   Olly, as the designer and manufacturer of Olly Melatonin, issued material, written warranties by representing that Olly Melatonin had a particular amount of melatonin per serving. This was an affirmation of fact about the products (i.e., a description of the ingredients) and a promise relating to the goods.

127.    This warranty was part of the basis of the bargain and Plaintiffs relied on this warranty.

128.    Olly Melatonin does not conform to this warranty because, as alleged in detail above, Olly's labelling is inaccurate and its dosing is unreasonably excessive.  Thus, the warranty was breached.

129.    Plaintiff Jiang provided pre-suit notice of their breach of warranty claim, sent to Olly's San Francisco headquarters and its California registered agent, on July 7, 2022.  Olly did not respond.

130.    Plaintiffs and Subclass members were injured as a direct and proximate result of Olly's breach because: (a) they would not have purchased Olly Melatonin if they had known that Olly's warranty was false; (b) they overpaid for the products because the products are sold at a price premium due to Olly's false warranty; or (c) they received products that were, in truth, worthless.

### Count 8: Unjust Enrichment/Quasi-Contract

### (on behalf of all Plaintiffs and the Nationwide Class)

131.    Plaintiffs incorporate each and every factual allegation set forth above.

132.    Plaintiffs bring this count individually and for the Nationwide Class.

133.    As alleged in detail above, Olly's false and misleading labelling caused Plaintiffs and the class to purchase Olly Melatonin and overpay for it.

134.    In this way, Olly received a direct and unjust benefit, at the expense of Plaintiffs and the class.

135.    Plaintiffs and the class seek the equitable return of this unjust benefit.

**VII.    Jury Demand.**

136.    Plaintiffs demand a jury trial on all issues so triable.

**VIII.    Prayer for Relief.**

137.    Plaintiffs seek the following relief individually and for the proposed class and subclasses:

- An order certifying the asserted claims, or issues raised, as a class action;
- A judgment in favor of Plaintiffs and the proposed class;
- Damages, including statutory damages, as available by law;

- Restitution, disgorgement, and other just equitable relief;
- An injunction;
- Attorney fees, as available by law;
- Pre- and post-judgment interest;
- Any additional relief that the Court deems reasonable and just.

Dated: October 12, 2022                    Respectfully submitted,

By: */s/ Jonas Jacobson*

Jonas B. Jacobson (Cal. Bar No. 269912)
jonas@dovel.com
Simon Franzini (Cal. Bar No. 287631)
simon@dovel.com
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: (310) 656-7069

*Counsel for Plaintiffs*

EXHIBIT 1





1













4



















