1
2
3
4
5

IN THE UNITED STATES DISTRICT COURT

6

FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    HOPE MURPHY, et al.,                Case No. 22-cv-03760-CRB

9             Plaintiffs,

10        v.                              **ORDER GRANTING IN PART AND
                                          DENYING IN PART MOTION TO
11                                        DISMISS**

OLLY PUBLIC BENEFIT
CORPORATION,

12

Defendant.

13

14        Plaintiffs Hope Murphy, Carol Lesh, and Emily Jiang bring this putative class

15   action against Defendant Olly Public Benefit Corporation in connection with Olly's

16   melatonin supplements.[1]  Plaintiffs allege that Olly's products include significantly more

17   melatonin than the label asserts, and therefore violate state consumer protection laws.  Olly

18   moves to dismiss on a number of grounds.  MTD SAC (dkt. 30).  Because Olly's

     arguments largely fail at this stage, the Court grants in part and denies in part the motion.

19

20   **I.      BACKGROUND[2]**

21        **A.      The Parties**

22        Olly, a Delaware corporation, sells melatonin supplements nationwide at retailers

23   like Walmart, Whole Foods, and Target.  SAC (dkt. 27) ¶¶ 3, 12.  Murphy lives in

24   California, and purchased an Olly melatonin product in California.  Id. ¶ 8.  Lesh lives in

25   California, and purchased an Olly melatonin product in California.  Id. ¶ 9.  Jiang lives in

26

27   [1] This is one of several melatonin suits brought by this law firm.  Lopez v. Zarbee's, Inc.,
     C22-4465, is also before the Court.  This order, although based only on the facts of this
     case, borrows from the Court's order in Lopez.
28   [2] These background facts are drawn from the complaint and accepted as true for the
     purposes of this motion.

United States District Court
Northern District of California

New York, and purchased an Olly melatonin product in New York.  Id. ¶ 10.

### B.    FDA Regulations for Dietary Supplements

Melatonin is a neurohormone that regulates sleep.  Id. ¶ 1.  Millions of consumers take over-the-counter melatonin supplements to help them sleep.  Id.  Federal law imposes a comprehensive regulatory scheme for dietary supplements, including melatonin supplements.  See generally FDCA, 21 U.S.C. § 301 et seq.; 21 C.F.R. Part 100 et seq. Under applicable FDA regulations, melatonin qualifies as an "other dietary ingredient," meaning that the quantity of melatonin in a supplement must be listed on the product label. 21 C.F.R. § 101.36(b)(3)(i).  The declared quantity of melatonin must be established by a specific FDA-mandated test "consisting of 12 subsamples (consumer units), taken 1 from each of 12 different randomly chosen shipping cases, to be representative of a lot."  See 21 C.F.R. § 101.9(g)(2); 21 C.F.R. § 101.36(f)(1) (applying this testing method to "other dietary ingredients").

The FDA forbids supplement labels that overstate quantities.  FDA regulations require that the quantity of melatonin "be at least equal to the value . . . declared on the label" for the product's full shelf life.  See 21 C.F.R. § 101.9(g)(4)(i).  A product that has less melatonin than is listed on the label is "misbranded."  See 62 Fed. Reg. 49826-01 at 49839 (Sept. 23, 1997).

The FDA treats supplement labels that understate quantities differently.  The FDA recognizes that some supplements, like melatonin, degrade over time, "such that a product that contains a certain amount of a supplement when it is put on the shelves might have less of that supplement at expiration."  SAC ¶ 25.  The FDA further recognizes that some manufacturers formulate their supplements with overages to ensure "that the finished product can meet the label declaration for that dietary ingredient throughout the product's shelf life."  68 Fed. Reg. 12158, 12203 (Mar. 13, 2003).  Accordingly, there is a safe harbor: "[r]easonable excesses over labeled amounts are acceptable within current good manufacturing practice."  21 C.F.R. § 101.36(f)(1).  Current good manufacturing practice requires manufacturers to keep track of "any intentional overage amount of a dietary

2

ingredient." 21 C.F.R. § 111.210(e).[3]

Although the FDA allows for overages, it does not intend "to allow a manufacturer to add excess dietary ingredients in unspecified amounts that would be in excess of the amount actually needed to meet the label declaration."  68 Fed. Reg. 12158, 12203; see also 72 Fed. Reg. at 34884 ("the amount of overage should be limited to the amount needed to meet the amounts listed in accordance with final § 111.210(d).").  The FDA has declined to adopt a specific cap on overages.  See, e.g., 60 Fed. Reg. 67194-01 at 67207 (Dec. 28, 1995) (declining proposed 20% overage cap).

### C.     This Litigation

In Fall of 2021, Lesh purchased a bottle of Olly Sleep Extra Strength from a Whole Foods store in Berkeley, California.  SAC ¶ 56.  She "read and relied on the accuracy of the melatonin content on the label."  Id.  "She selected and purchased a 5 mg dose (and not a higher claimed dose) because she did not want to take more than 5 mg of melatonin from the product, due to increased concerns about side effects and safety."  Id.  "While taking the Olly product, she experienced unwanted daytime grogginess," which went away when she stopped taking it.  Id.  She would not have purchased the melatonin had she known that it "was inaccurately labeled and unreasonably overdosed."  Id.

In Fall of 2021, Jiang purchased a bottle of Olly Sleep from a Target store in Clinton, New York.  Id. ¶ 57.  They[4] "read and relied on the accuracy of the melatonin content on the label."  Id.  "Because their psychiatrist recommended 5–6 mg (and no more)[,] they wanted to purchase a product where two servings would be 6 mg (and no more)."  Id.  Melatonin causes them "abnormally intense dreaming and associated sleep disruption, which is exacerbated at higher doses."  Id.  Accordingly, they did not want more than 6 mg of melatonin, "due to increased concerns about side effects and safety."  Id.  They would not have purchased the melatonin had they known that it "was inaccurately labeled and unreasonably overdosed."  Id.

---

[3] Manufacturers need not report those overages on their labels.  62 Fed. Reg. at 49831.
[4] Jiang's pronouns are they/them.  Id. at 2 n.1.

3

United States District Court
Northern District of California

In March of 2022, Murphy purchased a bottle of Olly Sleep from either a Walmart or Winco store in Oceanside, California.  Id. ¶ 58.  She "read and relied on the accuracy of the melatonin content on the label."  Id.  She selected a 3 mg dose "because she did not want to take more than 3 mg of melatonin from the product, "due to increased concerns about side effects and safety."  Id.  She would not have purchased the melatonin had she known that it "was inaccurately labeled and unreasonably overdosed."  Id.

Plaintiffs did a liquid chromatograph-mass spectrometry analysis on some Olly melatonin products.  Id. ¶¶ 6, 41.  It appears that Plaintiffs tested four non-expired bottles (three gummies per bottle) and four expired, or nearly expired, bottles.  Id. ¶ 41.  "The true amount of melatonin in Plaintiffs' bottles was 165% to 274% of the amount claimed."  Id. ¶ 6.  "[O]nce Olly Melatonin expires, there is still far too much melatonin, compared to the amount claimed on the label."  Id. ¶ 42.  "This was true across lots, within and across product types, and across expiration dates."  Id. ¶ 43.  Olly melatonin products contain, allegedly, "far more melatonin than the 'reasonable excess' permitted by the FDA."  Id. ¶ 6.  Moreover, Plaintiffs allege that "Olly's own data will confirm that Olly's melatonin products have an unreasonable excess of melatonin" based on the records the FDA requires supplement manufacturers to create and keep.  Id. ¶ 43.

Plaintiffs Murphy and Lesh initially brought suit in June of 2022, arguing that Olly's products do "not have the amount of melatonin claimed on the label."  See Compl. (dkt. 1) ¶ 27.  Plaintiffs amended the complaint in June of 2022.  See FAC (dkt. 17).  Olly moved to dismiss the FAC.  See First MTD (dkt. 21).  Per the parties' stipulation, Plaintiffs then filed the SAC.  See Stip. (dkt. 23); SAC.  The SAC now alleges that

> If Olly Melatonin were reasonably dosed, the amount of melatonin at the end of the shelf life (when the bottle expires) would be materially the same as the claim on the label, i.e., close to 100% of the claimed amount.  In contrast, if Olly has an unreasonable excess of melatonin, even after a bottle expires (i.e., its shelf life is over) there will be materially more melatonin than the amount specified on the label.  The test results . . . confirm that Olly has an unreasonable excess of melatonin.

SAC ¶ 41.  It includes claims for violation of: (1) California, Connecticut, Illinois,

4

1    Maryland, Missouri, and New York consumer protection laws; (2) California's Unfair

2    Competition Law (UCL); (3) California's False Advertising Law (FAL); (4) California's

3    Consumers Legal Remedies Act (CLRA); (5) New York General Business Law § 349; (6)

4    New York General Business Law § 350; as well as: (7) breach of express warranty; and (8)

5    unjust enrichment/quasi-contract.  Id. ¶¶ 67–110.  Olly again moves to dismiss.  See MTD

6    SAC; see also RJN (dkt. 31).

7    ## II.    LEGAL STANDARD

8         Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court may dismiss

9    a complaint for failure to state a claim upon which relief may be granted.  The Court may

10   base dismissal on either "the lack of a cognizable legal theory or the absence of sufficient

11   facts alleged under a cognizable legal theory."  Godecke v. Kinetic Concepts, Inc., 937

12   F.3d 1201, 1208 (9th Cir. 2019) (cleaned up).

13        A complaint must plead "sufficient factual matter, accepted as true, to state a claim

14   to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (cleaned

15   up).  A claim is plausible "when the plaintiff pleads factual content that allows the court to

16   draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.

17   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

18   statements, do not suffice" to survive a 12(b)(6) motion.  Id. (citing Bell Atlantic v.

19   Twombly, 550 U.S. 544, 555 (2007)).  When evaluating a motion to dismiss, the Court

20   "must presume all factual allegations of the complaint to be true and draw all reasonable

21   inferences in favor of the nonmoving party."  Usher v. City of Los Angeles, 828 F.2d 556,

22   561 (9th Cir. 1987).  "Courts must consider the complaint in its entirety, as well as other

23   sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in

24   particular, documents incorporated into the complaint by reference, and matters of which a

25   court may take judicial notice."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S.

26   308, 322 (2007).

27        If a court dismisses a complaint for failure to state a claim, it should "freely give

28   leave" to amend "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  A court may deny

United States District Court
Northern District of California

leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008).

## III. DISCUSSION

Olly argues that the SAC should be dismissed because: (A) all of the claims are preempted; (B) the doctrine of primary jurisdiction requires deference to the FDA; (C) Murphy and Lesh fail to state a claim under California consumer protection laws; (D) Plaintiffs are not entitled to monetary relief; (E) Plaintiffs' fraud claims are not pleaded with the requisite particularity; (F) Plaintiffs lack standing; (G) Plaintiffs' express warranty claims fail; (H) Plaintiffs' unjust enrichment claims fail; and (I) Jiang fails to state a claim under New York consumer protection laws. Most of these arguments are unpersuasive.

### A. Preemption

Olly argues that the FDA expressly preempts Plaintiffs' claims because Plaintiffs "seek to impose different requirements than [the] FDA." MTD SAC at 3. Olly also argues that the FDCA impliedly preempts Plaintiffs' claims because those state claims would not exist if the FDCA did not exist. Id. at 6. "Preemption is an affirmative defense," so the burden is on Olly to prove it. See Cohen v. ConAgra Brands, Inc., 16 F.4th 1283, 1289 (9th Cir. 2021).

#### 1. Express Preemption

The FDA expressly preempts state law claims that seek to impose manufacturing and labeling requirements for dietary supplements that are "not identical to" federal requirements of the same type. 21 U.S.C. § 343-1(a)(1); see also 21 C.F.R. § 100.1(c)(4) ("not identical to" means "that the State requirement directly or indirectly imposes obligations . . . concerning the composition or labeling of food" that are "not imposed by or contained in the applicable [federal statute or regulation]" or "[d]iffer from those specifically imposed by or contained in the applicable [federal statute or regulation]"); 21 U.S.C. § 321(ff) (dietary supplements are "a food" within the meaning of the FDCA).

United States District Court
Northern District of California

### a.    Overages

Stressing that the FDA allows manufacturers to include overages in nutritional supplements, Olly contends that Plaintiffs' claims, all based on overages in Olly's melatonin products, are preempted.  MTD SAC 3–5.  Olly cites to Ochoa v Church & Dwight Co., Inc., No. 5:17-cv-2019-ODW (SP), 2018 WL 4998293 (C.D. Cal. Jan. 30, 2018), as an example of a court finding a plaintiff's overage claim preempted "because it was inconsistent with FDA regulations explicitly allowing such [an] overage."  Id. at 5.  But Ochoa does not help Olly.

In Ochoa, the plaintiff alleged based on independent laboratory testing that the defendant understated the amount of folic acid in its prenatal gummies.  2018 WL 4998293, at *1.  The plaintiff alleged that the label on defendant's gummies denotes 800 mcg of folic acid per serving, but that the lab found amounts of 1,100 mcg and 2,047 mcg in the tested gummies, and that the upper tolerable intake limit for folic acid is 1,000 mcg.  Id.  The court discussed the same authority cited herein about overages, and then turned to the defendant's argument that the plaintiff "seeks to impose a labeling requirement that is not 'identical' to the FDA supplement label regulations.'"  Id. at *4.  The court concluded that the plaintiff's claims were preempted because "she has not pled that the excess (or overage) is unreasonable and not consistent with good manufacturing practices for insuring that the folate level does not fall below the label amount during the product's shelf life."  Id. at *5 (emphasis added).  Instead, she had alleged that the gummies had "'a materially significant amount in excess' that 'significantly exceeds the tolerable upper limit for folic acid.'"  Id.  Because the regulations did not include those standards, the plaintiff was "seek[ing] to impose requirements that plainly are not in the regulations."  Id.[5]  However, the court concluded that the plaintiff could amend her complaint to correct this deficiency, and granted her leave to amend.  Id.

Olly argues repeatedly that "Plaintiffs seek to impose a 10–15% standard that does

---

[5] The court also held that the plaintiff failed to allege that she had used the FDA's testing methods.  Id.  The Court addresses that issue next but notes that Ochoa (filed 1/30/18) pre-dates Durnford v. MusclePharm Corp., 907 F.3d 595 (9th Cir. 2018) (filed 10/12/18).

not exist in the law."  MTD SAC at 5; <u>see also</u> <u>id.</u> ("Plaintiffs' attempt to impose a 10–15% overage limitation, where FDA regulations do not impose such a requirement, is improper."); <u>see also</u> <u>id.</u> at 4 ("Plaintiffs . . . conclude that the Products' overages exceed their fabricated 10–15% standard"); <u>id.</u> at 3 (criticizing "new theory" that overages over 10–15% are unreasonable).  That mischaracterizes Plaintiffs' claims.

In the SAC, Olly's claim is precisely what was missing in <u>Ochoa</u>.  See SAC ¶¶ 29 ("if a manufacturer includes materially more melatonin than is actually needed to ensure that by the time the shelf life ends, the product has approximately the amount of melatonin that is declared on the label, this violates the FDA's mandates"); 41 ("if Olly has an unreasonable excess of melatonin, even after a bottle expires (i.e., its shelf life is over) there will be materially more melatonin than the amount specified on the label," which would be "an unreasonable excess of melatonin.").  Although Olly focuses on the SAC's reference to a 10–15% overage as reasonable, Plaintiffs' point about the 10–15% overage is that "other U.S. manufacturers" who sell melatonin supplements put their products on the shelf with a 10–15% overage, which is "reasonable because, by the time the shelf life ends, the product has approximately the amount of melatonin that is declared on the label." SAC ¶ 28.  Plaintiffs do not argue that only a 10–15% overage would be reasonable, but that Olly's overages are so excessive by comparison that they could not possibly be necessary to ensure "that the [melatonin] level does not fall below the label amount during the product's shelf life."  <u>See</u> <u>Ochoa</u>, 2018 WL 4998293, at *5.  This might or might not be true: discovery can show how long it takes melatonin to degrade during a given product's shelf life.  In the meantime, Plaintiffs have invoked the correct standard.  They have not alleged that Olly did something wrong by doing something "specifically approved by the FDA."  <u>See</u> <u>Carter v. Novartis Consumer Health, Inc.</u>, 582 F. Supp. 2d 1271, 1285 (C.D. Cal. 2008).  They have not alleged that there is too much of something based on the "upper tolerable intake limit" or some other metric.  Instead, they allege that there is more than what is required to "meet the label declaration for that dietary ingredient throughout the product's shelf life."  <u>See</u> 68 Fed. Reg. 12158, 12203; <u>see also</u> 68 Fed. Reg. 12158, 12203

United States District Court
Northern District of California

(not intended to allow "excess dietary ingredients in unspecified amounts that would be in excess of the amount actually needed to meet the label declaration.").

Because Olly's claims would not impose requirements on manufacturers that are different from what the FDA requires, they are not preempted.  See Chavez v. Church & Dwight Co., Inc., No. 17 C 1948, 2018 WL 2238191, at *5, 6 (N.D. Ill. May 16, 2018) (no preemption where plaintiff alleged that "Church added more folic acid to Vitafusion than was necessary to ensure that the level of folic acid meets the labeled amount over the course of the supplement's shelf life" because that "plausibly alleges that Vitafusion is misbranded within the confines of the FDCA"); see also Jones v. Conagra Foods, Inc., 912 F. Supp. 2d 889, 896 (N.D. Cal. 2012) ("courts have repeatedly refused to find preemption" where "requirement imposed by state law effectively parallels or mirrors" federal law).

### b.    Testing Method

Olly also argues that Plaintiffs' claims are preempted because the FDA requires a specific testing method, and the SAC admits that Plaintiffs did not follow it.  See MTD SAC at 6; see also SAC ¶ 41 (describing a testing method that is indisputably not the FDA method).  Olly contends that "Courts in this Circuit have repeatedly recognized that such challenges to declared ingredient amounts that are not based on FDA's specified test method are preempted by the FDCA."  MTD SAC at 6.  This was clearly the law at one point.  See, e.g., Mee v. I A Nutrition, Inc., No. C-14-5006 MMC, 2015 WL 2251303, at *4 (N.D. Cal. May 13, 2015) ("As each district court to have considered the matter has found, where, as here, an FDA regulation provides that the question of compliance must be determined using the method specified therein, a state law claim that seeks to establish a violation of such regulation by a different methodology is preempted.").

But Durnford v. MusclePharm Corp., 907 F.3d 595 (2018), might represent a change in the law.  In Durnford, the plaintiff brought a misbranding claim about the composition of protein in a particular supplement.  907 F.3d at 603.  Although the issue of "whether or not there was compliance with the FDA's 12-sample testing protocol [did] not

matter" in that case, the court took the opportunity to comment:

> We need not address whether plaintiffs are <u>ever</u> required to allege, at the pleading stage, that there are tests contradicting the nutrition panel that comply with the FDA's testing protocols.  We note, however, that plaintiffs are generally not expected to provide evidence in support of their claims at the pleading stage . . . nor are they required to plead the 'probability' of their entitlement to relief[.]  In addition, FDCA preemption, like all federal preemption, is an affirmative defense. . . . 'Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6).'

<u>Id.</u> at 603 n.8.

Some district court cases have taken note of this dicta from <u>Durnford</u> and departed from the long-held practice noted in <u>Mee</u>.  Thus, in <u>Amavizca v. Nutra Manufacturing, LLC</u>, No. 08-cv-1324-RGK-MAA, 2020 WL 8837145, at *5 (C.D. Cal. Oct. 20, 2020), the court held that, where the plaintiff had not alleged that he followed the FDA 12-sample testing method but instead tested three bottles, none of which contained glucosamine sulfate, such allegations were "sufficient to survive Defendants' assertion of federal preemption."  The court noted that to require the plaintiff "to specifically allege testing in conformance with [the FDA method] would be tantamount to requiring [p]laintiff 'to provide evidence in support of [his] claims at the pleading stage.'"  <u>Id.</u> (citing <u>Durnford</u>, 907 F.3d at 603 n.8 and <u>Diamos v. Walmart Inc.</u>, No. 2:19-cv-5526-SVW-GJS, 2020 WL 1942322, at *3 (C.D. Cal. Jan. 9, 2020) (holding, where plaintiff alleged a complete absence of an advertised supplement, supported by allegations of independent testing, that plaintiff stated a claim for relief that was not preempted)); <u>see also</u> <u>Carrol v. S.C. Johnsons & Son, Inc.</u>, No. 17-cv-5828, 2018 WL 1695421, at *3 (N.D. Ill. March 29, 2018) ("Courts in this district have held that plaintiffs can sufficiently allege mislabeling claims based on preliminary testing that was not completed in compliance with FDA standards.").

<u>Lozano v. Bowmar Nutrition LLC</u>, No. 2:21-cv-4296-MCS-KS, 2021 WL 4459660 (C.D. Cal. Aug. 19, 2021) is somewhat different and represents a line of cases the Court must acknowledge.  In <u>Lozano</u>, the court cited <u>Durnford</u> in holding that "[f]ederal pleading

10

United States District Court
Northern District of California

standards do not require Plaintiff to affirmatively allege that her laboratory testing comports with the FDA sampling regulation." 2021 WL 4459660, at *6 (citing Durnford, 907 F.3d at 603 n.8). The court noted that preemption would not be an issue if the plaintiff had "stood solely on allegations that the products contain less protein than Defendant represented." Id. However, Lozano also stated that "the reports [that the plaintiff relied upon] do not admit noncompliance with FDA sampling methodology" and so it was not as if the plaintiff had pleaded itself out of court. Id.; see also Rubio v. Orgain, Inc., No. EDCV 18-2237-MWF (SHKx), 2019 WL 1578379, at *3–4 (C.D. Cal. March 5, 2019) (finding claim preempted where plaintiff attached testing that was not FDA-compliant); Forouzesh v. CVS Pharmacy, Inc., No. 2:18-cv-4090-ODW (AFMx), 2019 WL 652887, at *5 (C.D. Cal. Feb. 15, 2019) (holding that "requiring at least some facts to support a plausible inference of FDA-compliant testing is proper" and stating that "[e]ven courts that do not require factual support for FDA-compliant testing agree that a claim seeking to use a methodology other than that required by the FDA would be preempted.").

Here, unlike in Lozano, the SAC does make clear that Plaintiffs did not test 12 samples according to the FDA's method. See SAC ¶ 41; Opp'n (dkt. 35) at 5 ("Plaintiffs tested eight bottles of Olly, including different types, from different lots, with different expiration dates."). However, this Court does not agree with the authority that would therefore conclude that Plaintiffs had pleaded themselves out of court. Pleading that one has conducted independent, non-FDA compliant testing that suggests an unreasonable overage does not suggest that one could not support allegations of unreasonable overage with FDA-compliant testing. It is a reasonable inference at this stage that "if less-exhaustive test results indicate that a supplement is overdosed, it is plausible . . . that the supplement is in fact overdosed." See Opp'n at 7; see also Warren v. Whole Foods Market California, Inc., No. 21-cv-4577-EMC, 2022 WL 2644103, at *6 (N.D. Cal. July 8, 2022) ("The alleged inadequacies in methodology or interpretation of scientific testing do not warrant dismissal under Rule 12(b)(6) so long as the court can still reasonably infer from the testing result and other alleged facts, taken as true, that the defendant is liable for the

misconduct alleged.").  Requiring plaintiffs to allege that they complied with the FDA

testing method would be requiring them to "provide evidence in support of [their] claims at

the pleading stage.'"  See Durnford, 907 F.3d at 603 n.8.  That is not required in notice

pleading, see Iqbal, 556 U.S. at 678 (requiring sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face,"), and might be difficult to do, see Muir

v. NBTY, Inc., No. 15 C 9835, 2016 WL 5234596, at *5 (N.D. Ill. Sept. 22, 2016) ("the

court is uncertain how a plaintiff, prior to discovery, would have access to 'randomly

chosen shipping cases' from which he could have selected 12 consumer samples that he

could be sure had come 'from a single lot.'"); see also Opp'n at 8 (arguing that facts about

overages are peculiarly within Olly's knowledge); SAC ¶ 43 (FDA requires Olly to retain

internal testing re overages so "it is reasonable to infer that Olly's own testing (using FDA

protocols) will confirm that the products are substantially (and unreasonably) overdosed.").

Like the plaintiff in Amavizca who tested just three samples, 2020 WL 8837145, at

*5, Plaintiffs have alleged enough to plausibly claim that Olly violates the FDA standard

for overages.  Put another way, Olly has not met its burden to establish that Plaintiffs

pleaded themselves out of court by pleading facts that establish Olly's compliance with

FDA regulations.

Plaintiffs will eventually have to prove that Olly failed to comply with the FDA

overage regulations.  See Chavez, 2018 WL 2238191, at *5 ("To be sure, it remains to be

seen whether the predicate for Chavez's argument bears up under scrutiny.  But his claim

that including harmful levels of folic acid falls outside the bounds of reasonableness . . . is

by no means implausible."); Clay v. Cytosport, Inc., No. 15-cv-165 L DHB, 2015 WL

5007884, at *4 (S.D. Cal. Aug. 19, 2015) ("Of course, in order to ultimately prevail on

these claims, Plaintiffs will have to prove that Defendant did not comply with the FDCA

provisions listed above.  However, to state a claim, Plaintiffs only need to allege a

plausible violation of the FDCA.").  In addition, Olly may re-raise the issue of preemption

at a later point if appropriate.  See Lozano, 2021 WL 4459660, at *7 ("the Court declines

to dismiss the claims on this motion because the SAC does not squarely present a

1    preemption problem, but Defendant may renew its preemption challenge if Plaintiff's

2    claims prove inconsistent with the FDCA.").

3            The Court does not dismiss the SAC based on express preemption.

4                    **2.      Implied Preemption**

5            "A purported state-law claim does not exist where the 'claim is in substance . . . a

6    claim for violating the FDCA—that is, when the state claim would not exist if the FDCA

7    did not exist." Goldsmith v. Allergan, Inc., No. 09-cv-7088 PSG EX, 2011 WL 147714, at

8    *2 (C.D Cal. Jan. 13, 2011).  "[A] plaintiff may not ground his claims on violations of the

9    FDCA, but can assert other federal or state law claims independently actionable without

10   reliance on the FDCA." Id.  Thus, in Goldberg, the court dismissed a plaintiff's FAL and

11   UCL claims to the extent that they relied on "violations of the FDCA to create liability,"

12   but explained that such claims were "actionable if they include properly pleaded

13   allegations of false or misleading representations that resulted in" the plaintiff's injuries.

14   Id.

15          Olly argues that Plaintiffs' claims are "that Olly's labels are false and misleading

16   because the Products contain 'unreasonable' overages," based on FDA standards, and so

17   those claims are impliedly preempted.  MTD SAC at 6 (citing Davidson v. Sprout Foods

18   Inc., No. 22-cv-1050-RS, 2022 WL 13801090, at *4 (N.D. Cal. Oct. 21. 2022)).  This

19   misconstrues Plaintiffs' claims.  See Vassigh v. Bai Brands LLC, No. 14-cv-5127-HSG,

20   2015 WL 4238886, at *4 (N.D. Cal. July 13, 2015) ("Defendants in food labeling cases

21   frequently assert that claims brought pursuant to the UCL, CLRA, and FAL are preempted

22   by the FDCA—even where state law imposes identical requirements as the FDCA—

23   pursuant to the reasoning in Perez v. Nidek Co., Ltd., 711 F.3d 1109 (9th Cir. 2013) and

24   Pom Wonderful LLC v. Coca-Cola Co., 679 F.3d 1170 (9th Cir. 2012).  Courts in this

25   District routinely reject this argument.").

26          Plaintiffs are not bringing suit because Olly's conduct allegedly violates the FDCA;

27   they are bringing suit because Olly's conduct allegedly violates state consumer protection

28   laws in such a way that is consistent with the FDCA.  See generally SAC; Opp'n at 9

United States District Court
Northern District of California

13

("Here, take away the FDCA, and Olly's inaccurate dosing and labelling is still false and misleading under state law."); <u>Swearingen v. Santa Cruz Natural, Inc.</u>, No. 13-cv-4291-SI, 2016 WL 4382544, at *7 (N.D. Cal. Aug. 17, 2016) ("<u>Chobani</u> raised claims for violation of California's FAL, CLRA, and UCL; thus, they sued for conduct that violated California state law, not for conduct that violates the FDCA") (citing <u>Kane v. Chobani</u>, No. 12-cv-2425-LHK, 2013 WL 3703981 (N.D. Cal. July 12, 2013)); <u>Trazo v. Nestle USA, Inc.</u>, No. 5:12-cv-2272 PSG, 2013 WL 4083218, at *6 (N.D. Cal. Aug. 9, 2013) ("Plaintiffs here sue under state law—namely, the Sherman Law, UCL, FAL, and CLRA—and so their claims are not impliedly preempted.").

Plaintiffs rightly point out that Olly's logic has absurd implications: to avoid express preemption, plaintiffs have to plead that their claims parallel FDA requirements, but by referencing the FDA's requirements, plaintiffs' claims would be impliedly preempted.  <u>See</u> Opp'n at 10.  That is not how it works.  <u>See</u> <u>Perez</u>, 711 F.3d at 1120 (explaining that "[t]he plaintiff must be suing for conduct that <u>violates</u> the FDCA (or else his claim is expressly preempted . . . ), but the plaintiff must not be suing <u>because</u> the conduct violates the FDCA (such a claim would be impliedly preempted . . .).").

The Court does not dismiss the SAC based on implied preemption.

**B.      Primary Jurisdiction**

Olly argues that "the Court should dismiss this action on primary jurisdiction grounds because Congress has delegated authority to [the] FDA to administer the uniformity of dietary supplement labeling."  MTD SAC at 7.  Olly contends that "[r]esolving Plaintiffs' claims would require technical analysis of what amount of melatonin is a 'reasonable' [sic] under FDA's current good manufacturing practice based on the rate of degradation during a product's shelf life and the expiration date set for the Product" is a decision "best reserved for FDA, whose purpose is to regulate such complicated matters."  <u>Id.</u>

Primary jurisdiction "is a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decisionmaking responsibility should

14

be performed by the relevant agency rather than the courts." Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc., 307 F.3d 775, 780 (9th Cir. 2002).  The primary jurisdiction doctrine "permits judicial deference to administrative expertise." Bradley v. CVS Pharmacy, Inc., 64 Cal. App. 5th 902, 912 (2021).  However, the doctrine does not "'require[] that all claims within an agency's purview . . . be decided by the agency,'" and is not "intended to 'secure expert advice' for the courts from regulatory agencies every time a court is presented with an issue conceivably within the agency's ambit.'" Syntek, 307 F.3d at 780 (quoting Brown v. MCI WorldCom Network Servs., Inc., 277 F.3d 1166, 1172 (9th Cir. 2002)).  Instead, it is a "'doctrine used by the courts to allocate initial decisionmaking responsibility between agencies and courts where such [jurisdictional] overlaps and potential for conflicts exist.'" Id. (quoting Richard J. Pierce, Jr., Administrative Law Treatise § 14.1, p. 917 (4th ed. 2002)).  Courts traditionally consider four factors in weighing whether to apply the primary jurisdiction doctrine: "[a] the need to resolve an issue that [b] has been placed by Congress within the jurisdiction of an administrative body having regulatory authority [c] pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that [d] requires expertise or uniformity in administration." Syntek, 307 F.3d at 781 (citing U. S. v. General Dynamics, 828 F.2d 1356, 1362 (9th Cir. 1987)).

It is not clear that there is a need for the FDA to resolve the issue of unreasonable overages.  The FDA has already provided helpful guidance on that issue, explaining that it does not intend "to allow a manufacturer to add excess dietary ingredients in unspecified amounts that would be in excess of the amount actually needed to meet the label declaration," 68 Fed. Reg. 12158, 12203, and that "the amount of overage should be limited to the amount needed to meet the amounts listed in accordance with final § 111.210(d)," see 72 Fed. Reg. at 34884.  See also Musgrave v. ICC/Marie Callender's Gourmet Prods. Div., No. 14-cv-2006-JST, 2015 WL 510919, at *6 (N.D. Cal. Feb. 5, 2015) (primary jurisdiction unnecessary where FDA has provided guidance on issue).

Nor is it clear that the Court need defer to FDA expertise on nutritional

15

supplements.  As Plaintiffs assert: "the FDA's standard is not hyper-technical to apply.  If Olly's expired bottles have more melatonin than the labelling declaration"—the Court would add the concept of "reasonableness" in there—"Olly is violating the standard." Opp'n at 11.  The court in <u>Chavez</u> explained that "Church also overstates the need to rely on the FDA's expertise.  Federal district courts are well equipped to interpret agency regulations, including those involving current good manufacturing practices." <u>Chavez</u>, 2018 WL 2238191, at \*8; <u>see also</u> <u>id.</u> ("this case primarily concerns allegations of false and misleading representations, the sort of allegations that district courts routinely address."); <u>Jones</u>, 912 F. Supp. 2d at 898 ("this case is far less about science than it is about whether a label is misleading.").

Courts are also supposed to consider whether applying primary jurisdiction would promote efficiency.  See <u>Robles v. Domino's Pizza, LLC</u>, 913 F. 3d 898, 910 (9th Cir. 2019) ("'efficiency' is the 'deciding factor' in whether to invoke primary jurisdiction."). Accordingly, "courts in the Northern District of California have generally declined to dismiss the complaint on primary jurisdiction absent concrete evidence that the FDA is currently involved in creating a new [relevant] regulation." <u>Trazo</u>, 2013 WL 4083218, at \*6 n.55.  While the court in <u>Ochoa</u> was hopeful that "the FDA is contemplating additional guidance on the issue" of overages in January of 2018, <u>see</u> 2018 WL 4998293, at \*8, the Court in <u>Chavez</u> commented later that same year that "there is no indication of when, if ever, the FDA will act," <u>see</u> 2018 WL 2238191, at \*8.  The FDA has yet to act.  Deferring to the FDA would not be efficient.

Accordingly, the Court does not apply the doctrine of primary jurisdiction.

## C.    California Consumer Protection Laws

Olly argues that Plaintiffs fail to state a claim under the California consumer protection laws because they fail to plausibly allege reliance, materiality, deception or injury.  MTD SAC at 8.  It notes that "[s]tatements can give rise to a plausible UCL, FAL, or CLRA claim only if they are likely to deceive a reasonable consumer," and reasons that "[n]one of Plaintiffs' theories of deception" meet that standard.  <u>Id.</u> (citing <u>Reid v. Johnson</u>

16

& Johnson, 780 F.3d 952, 958 (9th Cir. 2015)).

Olly argues that Plaintiffs fail to plausibly allege a misrepresentation because "the labeling complies with federal law and is truthful and accurate."  MTD SAC at 8.  But the SAC alleges, plausibly, that Olly's melatonin products do not comply with federal law because they unreasonably overstate the amount of melatonin within.  See generally SAC. Olly also argues that Plaintiffs fail to plausibly allege that Olly's claims are false and misleading because of "their conclusory and inaccurate testing."  MTD SAC at 8.  Again, this order already rejects Olly's argument about Plaintiffs' testing methods at this stage.

Olly next contends that Plaintiffs fail to plausibly allege reliance and deception because Plaintiffs wanted the exact amount of melatonin stated on the label.  Id.at 9 (citing SAC ¶¶ 56–58).  "Generally, the question of whether a business practice is deceptive presents a question of fact not suited for resolution on a motion to dismiss."  Jones, 912 F. Supp. 2d at 899.  In any case, Olly mischaracterizes Plaintiffs' allegations.  For example, while Lesh "did not want to take more than 5 mg of melatonin from the product, due to increased concerns about side effects and safety," the SAC goes on to say that "[s]he would not have purchased the product if she knew that Olly Melatonin was inaccurately labelled and unreasonably overdosed."  SAC ¶ 56 (emphasis added).  Olly also argues that customers do not care about overages because they "do not possess technical and scientific knowledge regarding melatonin, degradation, or what constitutes a 'reasonable overage.'" MTD SAC at 9.  But the SAC plausibly alleges otherwise.  See, e.g., SAC ¶¶ 21 ("consumers don't want to unwittingly take excessive amounts of a neurohormone that alters brain chemistry"), 23 ("consumers want to make their own, informed decision about the dosage that is right for them. . . . This choice is reflected by their decision to purchase 3 mg, instead of a higher dose.").

Olly's materiality argument is along the same lines: "[i]t is simply not plausible . . . that reasonable consumers understand the difference between 'reasonable' and 'unreasonable overages.'"  MTD SAC at 9–10.  Olly asserts that "consumers purchase Olly's Products for many different reasons," including form (gummy, powder, soft gels)

17

1    and flavors, ingredients and branding.  Id. at 10.  That may be right, but the SAC plausibly

2    alleges that the melatonin dosage is material to consumers in selecting an Olly melatonin

3    product.  See, e.g., SAC ¶ 23.

4         Olly's argument about injury is also unpersuasive: Olly complains that "Plaintiffs

5    continue to allege that the mislabeling renders the Products 'totally worthless'" when "this

6    is not an inappropriate [sic] measure of damages for a false advertising claim."  MTD SAC

7    at 10 (citing Brazil v. Dole Packaged Foods, LLC, No. 12-cv-1831-LHK, 2014 WL

8    5794873, at *14 (N.D. Cal. Nov. 6, 2014) (discussing "price premium" attributable to

9    labeling claim)).  Whatever the proper measure of damages, Plaintiffs cover their bases by

10   alleging both that they paid a premium for the unreasonably overdosed melatonin products,

11   see, e.g., SAC ¶ 53 ("If consumers knew the truth—that this bottle was inaccurately

12   labelled and unreasonably overdosed—Olly could not sell it for anything close to $12.89

13   (or even sell it at all). . . . Plaintiffs and each class member paid a substantial price

14   premium driven by Olly's false and misleading labelling."), and that the products are

15   worthless, see id. ¶ 54 ("Plaintiffs and each class member paid for Olly Melatonin products

16   that are, in truth, worthless.  Thus, the full economic injury here is the entire price of the

17   Olly Melatonin that Plaintiffs and class members purchased.").  Because Plaintiffs alleged

18   what Olly says they should have alleged, this is not a basis for dismissal.

19        Plaintiffs have adequately alleged violation of the California consumer protection

20   laws.[6]

21   _____

22   [6] Olly argues in a footnote that Plaintiffs filed their complaint before providing notice, in
     violation of California Civil Code section 1782(a).  MTD SAC at 11 n.10.  Plaintiffs

23   respond that their initial complaint did not include a request for damages under the CLRA,
     and that they provided notice before they added the damages request.  Opp'n at 13; see

24   also SAC ¶ 108 ("CLRA § 1782 NOTICE" "On June 27, 2022, Plaintiffs Murphy and
     Lesh sent a CLRA demand letter to Olly's San Francisco headquarters and its California

25   registered agent. . . . provid[ing] notice of the particular violations alleged here and
     demand[ing] that Defendant correct the problem.").  California Civil Cide section 1782(d)

26   does provide that "[a]n action for injunctive relief" under the CLRA "may be commenced
     without compliance with" the notice provision and that "after the commencement of an

27   action for injunctive relief, and after compliance with [the notice provision], the consumer
     may amend his or her complaint without leave of court to include a request for damages."

28   Although the original complaint does include a request for damages, it is not explicitly tied
     to the CLRA claim.  Compl. (dkt. 1) ¶ 75.  In fact, there is not a standalone CLRA claim in

### D.   Monetary Relief

Olly argues that the Court should strike Plaintiffs' claim for equitable relief pursuant to Sonner v. Premier Nutrition Corporation, 971 F.3d 834, 844 (9th Cir. 2020), because "Plaintiffs fail to plausibly allege why their harm cannot be cured with monetary damages."  MTD SAC at 10–11.  In Sonner, the Ninth Circuit held that a plaintiff "must establish that she lacks an adequate remedy at law before securing equitable restitution for past harm under the UCL and CLRA."  971 F.3d at 844.  Because the complaint in that case did not allege that the plaintiff lacked an adequate legal remedy, and the plaintiff conceded that she sought the same amount of money in restitution that she did in damages, the district court was correct to dismiss the claims for restitution under the UCL and CLRA.  Id.

A number of district court cases since Sonner have concluded that it has minimal application at the pleading stage.  In Nacarino v. Chobani, LLC, No. 20-cv-7437-EMC, 2022 WL 344966, at *9–10 (N.D. Cal. Feb. 4, 2022), Judge Chen explained that "Sonner teaches that a plaintiff, on the eve of trial, cannot create an inadequacy of a legal remedy by eliminating its availability by taking volitional action," but declined, in the case before him, to dismiss the plaintiff's equitable restitution claim at the motion to dismiss stage. Judge Chen discussed approvingly Johnson v. Trumpet Behavioral Health, LLC, in which Judge Orrick explained "because Sonner was decided at a later posture, I agree with the plaintiffs that, if a plaintiff pleads that she lacks an adequate legal remedy, Sonner will rarely (if ever) require more this early in the case . . . [and that] it is too early to determine whether the plaintiffs' legal remedies will ultimately be adequate, so it makes sense to defer this determination."  Navarino, 2022 WL 344966, at *10 (quoting Johnson v. Trumpet Behavioral Health, LLC, No. 3:21-cv-3221-WHO, 2022 WL 74163, at *3 (N.D.

---

the original complaint, as there is in the SAC.  See id. ¶ 46 (listing Cal. Civ. Code § 1750 among the statutes for the Multi-State Consumer Protection Class).  There was a standalone CLRA claim in the FAC, and it included the same allegation of a June 27, 2022 notice.  See FAC (dkt. 17) ¶ 88.  That claim explicitly includes "all monetary and equitable relief available under the CLRA").  Id.  The June 27, 2022 notice predates the request for damages in the FAC and therefore complies with section 1782.

Cal. Jan. 7, 2022)).  Similarly, in McKinney, this Court explained that "[a]lthough Plaintiffs can pursue equitable claims in the alternative to legal remedies, they are still required to explain how, or plead that, the legal remedies are inadequate."  McKinney v. Corsair Gaming, Inc., No. 22-CV-00312-CRB, 2022 WL 2820097, at *10 (N.D. Cal. July 19, 2022) (citing Sonner, 971 F.3d at 844; Anderson v. Apple Inc., 500 F. Supp. 3d 993, 1009 (N.D. Cal. Nov. 16, 2020) ("Under Sonner, the plaintiffs are required, at a minimum, to plead that they lack an adequate remedy at law, which they have not done.")).  The Court granted the motion to dismiss the request for equitable relief because plaintiffs had not even "pleaded that damages are inadequate."  Id.

Here, Olly complains that Plaintiffs "seek damages" and, in the alternative, restitution, alleging that they have "no adequate remedy at law."  MTD SAC at 11 (quoting SAC ¶ 61).  Olly acknowledges that Plaintiffs assert that equitable relief is more "certain" and lacks "additional showings" like loss of "market value" or notice, but Olly points out that Plaintiffs "fail to demonstrate why they could not satisfy these requirements."  Id. (quoting SAC ¶¶ 62–63).  Plaintiffs may seek "relief in the alternative or different types of relief."  Nacarino, 2022 WL 344966, at *10 (quoting Fed. R. Civ. P. 8(a)(3)); see also id. (quoting Sagastume v. Psychemedics Corp., No. CV 20-6624 DSF (GJSx), 2020 WL 8175597, at *7 (C.D. Cal. Nov. 30, 2020) ("Sonner does not hold that plaintiffs may not seek alternative remedies at the pleading stage.")).  Sonner does not require Plaintiffs to "demonstrate" anything at the pleadings stage.  Plaintiffs alleged that legal remedies were not as certain as equitable remedies.  See SAC ¶¶ 62, 63 (explaining, for example, that for a full refund, Plaintiffs would have to show that the product has no market value, while that showing is not required for restitution).  That is sufficient.  See Anderson, 500 F. Supp. 3d at 1009 (adequate to allege that restitution "would be more certain, prompt, or efficient than the legal remedies they request.").

The Court does not dismiss the request for equitable relief at this point.

20

### E.    Fraud Claims

Olly argues that Plaintiffs fail to meet the Rule 9(b) pleading standard,[7] which requires them to allege why challenged statements are misleading, and why the alleged variation in melatonin amounts was material to their purchase.  MTD SAC at 11.  Plaintiffs respond that they do not need to meet the Rule 9(b) standard, because Olly could violate the UCL, FAL, or CLRA with mere negligence, but that in any case they have met it. Opp'n at 15 (citing Moore v. Mars Petcare UC, Inc., 966 F.3d 1007, 1019 n.11 (9th Cir. 2020).  Plaintiffs are correct; even if the Rule 9(b) standard applies, they have met it.

Olly relies on Anthony v. Pharmavite, No. 18-cv-2636-EMC, 2019 WL 109446, at *5 (N.D. Cal. Jan. 4, 2019), in which Judge Chen dismissed a complaint for failing to plead with particularity "what [the plaintiffs] saw, relied upon, and understood with respect to [defendant's] labeling."  MTD SAC at 11–12 (citing Anthony, 2019 109446, at *5).  But in Anthony, where one of the main issues was an asterisk containing a health disclaimer, "[t]he complaint [was] devoid of any allegations regarding whether Plaintiffs saw the asterisk, read the corresponding disclaimer, and if they did read it, how the disclaimer affected their purchasing decision.  In fact, the complaint [made] no mention of the asterisk or disclaimer at all."  2019 WL 109446, at *5.  Here, in contrast, Plaintiffs have alleged that they "read and relied on the accuracy of the melatonin content on the label (including the claimed dosage per serving on the front and back label), when buying the product and deciding to take it" and that they "selected and purchased" the melatonin product that they did "because [they] did not want to take more than [that quantity] of melatonin from the product, due to increased concerns about side effects and safety.  In other words, [they] chose not to purchase a higher dose because [they] did not want a higher dose."  SAC ¶ 56. The SAC therefore alleges not only that Plaintiffs saw the challenged statement, but that they relied on it in making their purchases and that it was material.  See also SAC ¶ 53 ("consumers demand melatonin that is accurately dosed and labelled. . . . a reasonable

---

[7] Rule 9(b) of the Federal Rules of Civil Procedure states in part that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

consumer who wanted to buy a product with 3 mg of melatonin would not buy an unreasonably overdosed and inaccurately labelled product").

Olly also contends that Plaintiffs fail to allege "why they were economically injured when they got <u>more</u> melatonin than advertised and they do not contend that the Products were not effective sleep aids." MTD SAC at 12. That is a rather disingenuous take on Plaintiffs' allegations. It is not as if Plaintiffs got a box with 11 chocolates in it when they were expecting 10. Plaintiffs allege that they wanted to take an accurate amount of a neurohormone that affects their brains, that they trusted the label's representation of how much of that neurohormone they were getting, and that the inaccuracy of that label was "alarming," such that the product was essentially worthless to them. <u>See</u> SAC ¶¶ 6, 20 ("The likelihood of side effects from melatonin increases with the dosage"); 54 ("In fact, without accurate dosing and labelling, Olly Melatonin is worthless. What reasonable consumer wants to buy a supplement that alters brain chemistry, if the product is inaccurately labelled and unreasonably overdosed?").

Olly's arguments under Rule 9(b) fail.

**F.    Standing**

Olly argues that Plaintiffs lack standing to bring claims: (1) based on products they did not purchase, (2) for injunctive relief, and (3) based on other states' laws. MTD SAC at 12–14.

### 1.    Unpurchased Products

A plaintiff may bring claims for products she did not purchase, so long as her injury from a product is "'substantially similar' to the injuries suffered by [the other] class members." <u>McKinney</u>, 2022 WL 2820097, at *13 (quoting <u>Garnica v. HomeTeam Pest Def., Inc.</u>, 14-cv-5243, 2015 WL 13066140, at *1–2 (N.D. Cal. Dec. 21, 2015)). Products are "substantially similar" if "the resolution of the asserted claims will be identical between the purchased and unpurchased products." <u>Ang v. Bimbo Bakeries USA, Inc.</u>, No. 13-cv-01196-WHO, 2014 WL 1024182, at *8 (N.D. Cal. Mar. 13, 2014). Thus, in the labelling context, if each label is "false in the same way," then the "unpurchased products .

. . do 'not implicate a significantly different set of concerns than' those purchased by the named plaintiffs" and thus, "[b]y establishing that any of the labels were misleading, the [p]laintiffs would necessarily establish that they all were." McKinney, 2022 WL 2820097, at *13 (quoting Garrison v. Whole Foods Market Group, Inc., No. 13-cv-5222-VC, 2014 WL 2451290, at *4 (N.D. Cal. June 2, 2014)).

Plaintiffs purchased only Olly Sleep Extra Strength gummies and Olly Sleep gummies, SAC ¶¶ 8–10, 56–58, and yet assert claims based on at least five other Olly melatonin products, id. Ex. 1.  These products have "different ingredients, flavors, forms (gummy, soft gel, and powder) and . . . different amounts of melatonin and degradation rates."  MTD SAC at 12 (emphasis in original).  While Plaintiffs allege that Olly's products all advertise melatonin and are all "unreasonably overdosed," that is insufficient.  See id. ¶¶ 46–49; see also id. ¶ 43 ("in Plaintiffs' testing, all of the Olly samples were substantially overdosed.  This was true across lots, within and across product types, and across expiration dates.  Accordingly, it is reasonable to infer that Olly's own testing . . . will confirm that the products are substantially (and unreasonably) overdosed."); 46 ("all Olly Melatonin is substantially the same: it is all unreasonably overdosed.").

Plaintiffs have not plausibly alleged that the non-purchased, non-tested Olly melatonin products are overdosed.  Their allegations on that point are speculative and conclusory.  See Iqbal, 556 U.S. at 678 (conclusory statements insufficient); see also Forouzesh, 2019 WL 652887, at *5 (dismissing complaint where plaintiff's "vague allegations broadly encompass the entire CVS Sport 100+ product line without identifying any factual similarities across those products beyond the SPF value.").

That the products all contain the same ingredient can sometimes satisfy the pleading standard.  See, e.g., Lanovaz v. Twinings N. Am., Inc., No. C-12-2646-RMW, 2013 WL 2285221, at *3 (N.D. Cal. May 23, 2013) (where plaintiff claimed that plant ingredient was not a "natural source of antioxidants" and 51 products were made from that same plant ingredient, there was a substantial similarity between the products).  But here, the issue is not the presence of a particular ingredient, it is the quantity of that ingredient.  See Ang,

2014 WL 1024182, at *8 ("where the actual composition or appearance of the product is legally significant to the claim at issue, the consumer may only be allowed to pursue claims for products with identical product composition and/or appearance.").  For that reason, Plaintiffs are simply incorrect in arguing that the "different ingredients, flavors, and forms" are "immaterial."  See Opp'n at 18.  Showing that melatonin was overdosed in the purchased products does not "necessarily establish" that it was overdosed in the other challenged products.  See McKinney, 2022 WL 2820097, at *13 (quoting Garrison, 2014 WL 2451290, at *4).

Accordingly, Plaintiffs have not adequately alleged that melatonin products are "substantially similar" such that "the resolution of the asserted claims will be identical between the purchased and unpurchased products."  See Ang, 2014 WL 1024182, at *8.  The claims based on unpurchased products are dismissed, with leave to amend.

### 2. Injunctive Relief

To pursue injunctive relief, a plaintiff must plead a "threat of injury [that is] actual and imminent, not conjectural or hypothetical."  Davidson v. Kimberly-Clark Corp., 889 F.3d 956, 967 (9th Cir. 2018) (internal quotation marks and citation omitted).  Olly argues that Plaintiffs fail to allege that they "will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although [they] would like to."  MTD SAC at 13 (quoting Davidson, 889 F.3d at 969–70).  That is just what Plaintiffs have alleged.  See SAC ¶ 59 ("Plaintiffs want Olly to fix its manufacturing practices and sell its melatonin products with accurate dosing and labelling.  If Olly fixes its products, so that they are accurately dosed and labelled, Plaintiffs intend to buy them and would buy them again. . . . Plaintiffs face an imminent threat of harm because they will not be able to rely on Olly's labels in the future, and will not be able to buy Olly Melatonin.").

Olly also notes that a plaintiff does not have "standing to seek injunctive relief when the allegations reveal that he or she now knows how to interpret an allegedly deceptive label and will no longer be deceived by that label."  MTD SAC at 13 (citing Fernandez v. Atkins Nutritionals, Inc., No. 3:17-cv-1628-GPC-WVG, 2018 WL 280028, at

United States District Court
Northern District of California

*15 (S.D. Cal. Jan. 3, 2018)).  But nothing in the SAC suggests that Plaintiffs "now know[] how to interpret" Olly's melatonin labels, other than to assume that they are dangerously inaccurate.  See generally SAC.  That is certainly not what Fernandez meant.  See Fernandez, 2018 WL 280028, at *15 ("Fernandez now knows how Atkins goes about calculating its net carbs claims, and she will not be misled next time she goes to Wal-Mart or Target and looks at Atkins's labels."); see also Davidson, 889 F.3d at 969–70 ("Knowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future.[]  In some cases, the threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to.").

Plaintiffs have standing to seek injunctive relief.

### 3.    Other States' Laws

Next is the question of whether Plaintiffs can bring claims under other states' laws. In Count 1, they bring a claim for violations of "state consumer protection laws that are materially-similar to the laws of California"—California, Connecticut, Illinois, Maryland, Missouri, and New York.  SAC ¶ 76.  Olly moves to dismiss Count 1 to the extent that it is based on the law of any state other than California and New York, where Plaintiffs reside and purchased Olly's products.  MTD SAC at  13–14.  Olly argues that differences in state laws preclude Plaintiffs from representing class members in other states.  Id. (citing Mazza v. American Honda Motor Co., 666 F.3d 581 (9th Cir. 2012); McKinney, 2022 WL 2820097, at *12).  In five brief bullet points, Olly characterizes the differences between California and New York law and the other states' laws.  See, e.g., id. at 14 ("IL requires proof of actual deception, while CA and NY require only proof of injury").

Plaintiffs respond that Olly has failed to show that the California law is materially different from other states' laws on the facts of the case, and that this Court should defer the issue until class certification.  See Opp'n at 20 (citing McKinney, 2022 WL 2820097). It is true that in McKinney, the Court held that: "Unlike in Mazza, Corsair has not

provided a sufficient description of other state laws to meet its burden of showing that Plaintiffs lack standing to bring claims under these other states' laws.  Corsair has presented essentially one page of argument in its motion, but it does not provide detail." Here, Olly's bullet points are far less than one page of argument, and there is no detail about how those differences apply in this case.

There have been a flurry of recent cases on this issue, generally either concluding that this is a standing issue or that it is a Rule 23 issue.  Judge Chen summarized some of the recent history in Sultanis v. Champion Petfoods USA Inc., No. 21-cv-162-EMC, 2021 WL 3373934, at *5 (N.D. Cal. Aug. 3, 2021), noting that "[c]ourts in the Ninth Circuit have been split on whether a named plaintiff in a putative class action has standing to assert claims under the laws of states where the named plaintiff does not reside or was injured."  He cited Jones v. Micron Technology, Inc., 400 F. Supp. 3d 897, 908 (N.D. Cal. 2019) ("[c]ourts in the Ninth Circuit have consistently held that a plaintiff in a putative class action lacks standing to assert claims under the laws of states other than those where the plaintiff resides or was injured") as representing what "most courts have held," then discussed approvingly Judge Chhabria's holding in Patterson v. RW Direct, Inc., No. 18-cv-55-VC, 2018 WL 6106379, at *1 (N.D. Cal. Nov. 21, 2018), that "whether a named plaintiff can represent class members whose claims arise under the laws of different states does not appear to be a question of standing [because] Patterson does not himself seek to raise a claim under the laws of a different state; rather, he seeks to represent a class member who can raise such a claim."  Sultanis, 2021 WL 3373934, at *5.  And he concluded "in line with Judge[] Chhabria . . . that whether a plaintiff can bring claims on behalf of unnamed plaintiffs under the laws of states in which the named plaintiff does not reside or was injured is a matter of typicality, adequacy, and predominance under Rule 23, not Article III standing."  Id. at *6.  Judge Chen nevertheless concluded that he had the discretion to decide at the pleadings stage that the plaintiff did not satisfy Rule 23, and did so in that case largely as a matter of case management because there were so many out-of-state putative class members.  Id. at *7.  Judge Chen's reasoning is persuasive.

In <u>McKinney</u>, the plaintiff had alleged that the defendant's packaging and advertisements contained deceptive and misleading statements in violation of the common law and consumer protection laws of California and 43 other states.  2022 WL 2820097, at *1.  This Court agreed that district courts have discretion to address this issue in either a motion to dismiss or a motion for class certification.  <u>Id.</u> at *11–12.  And this Court concluded that the defendant had not "provided a sufficient description of other state laws to meet its burden of showing that Plaintiffs lack standing to bring claims under those other states' laws."  <u>Id.</u> at *13.  More recently in <u>McKinney</u>, <u>see</u> Order on MTD (dkt. 53) in Case No. 3:22-cv-312-CRB at 12, the Court concluded that the defendant, having made a new showing, had "met its burden to show that the states' consumer protection regimes are different."

Here, in light of Olly's meager showing about other states' laws, <u>see</u> MTD SAC at 14, and because the SAC only asserts state claims for four additional states (far outweighed by the populations of California and New York), there is not the same case management concern that Judge Chen encountered in <u>Sultanis</u>.  The Court therefore denies Olly's motion to dismiss on this basis, but will allow Olly to re-raise this issue at a later date, likely framed as whether, per Rule 23, Plaintiffs can represent class members with claims based on other states' laws.

### G.    Breach of Express Warranty

Olly argues that Plaintiffs' claim for express warranty under New York and California law "fail for the same reasons as discussed."  MTD SAC at 14.  Because the Court does not conclude that Plaintiffs' claims fail—aside from their inclusion of products that Plaintiffs did not purchase—the Court rejects this argument.  Plaintiffs have plausibly alleged that Olly "issued material, written warranties by representing that Olly Melatonin had a particular amount of melatonin per serving," that "Plaintiffs relied on this warranty," and that Olly "does not conform to this warranty because, as alleged in detail . . . , Olly's labelling is inaccurate and its dosing is unreasonably excessive.  Thus, the warranty was breached."  <u>See</u> SAC ¶¶ 126, 128.  Plaintiffs also plausibly allege that they were injured as

a result of Olly's breach because they would not have purchased Olly's melatonin products if they had known the warranty was false.  See id. ¶ 130.  This is sufficient.  See Baltazar v. Apple, Inc., 10-cv-3231-JF, 2011 WL 588209, at *2 (N.D. Cal. Feb. 10, 2011) (citing Williams v. Beechnut Nutrition Corp., 185 Cal. App. 3d 135, 142 (1986)) ("[A] plaintiff must allege: (1) the exact terms of the warranty; (2) reasonable reliance thereon; and (3) a breach of warranty which proximately caused plaintiff's injury.").

The Court does not dismiss the express warranty claim.

### H.    Unjust Enrichment

Olly argues that "[b]ecause Plaintiffs' other claims should be dismissed, Plaintiffs' claim for unjust enrichment also fails."  MTD SAC at 15.  Because the Court does not conclude that Plaintiffs' claims fail—aside from their inclusion of products that Plaintiffs did not purchase—the Court rejects this argument.  Plaintiffs have plausibly stated a claim for unjust enrichment.  See SAC ¶¶ 131–35.

### I.    New York Consumer Protection Laws

Finally, Olly moves to dismiss SAC Counts 5 and 6, for violations of New York General Business Law sections 349 and 350.  MTD SAC at 15.  Section 349 provides in part that "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."  Section 350 provides that "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."  Olly argues first that Plaintiffs fail to state a claim because Olly's "labels comply with federal law."  Id. But this order concludes that Plaintiffs plausibly allege that Olly does not comply with federal law, so that argument fails.

Olly argues next that "Plaintiff [Jiang] fails to allege they experienced any side effects or safety concerns, or other harm" and that in fact, Jiang alleged that they wanted "5–6 mg" of melatonin, and "even based on Plaintiffs' testing, they received 4.96 mg of melatonin per serving."  Id.  Plaintiffs do not fail to allege that they suffered "any . . . other harm."  Id.  They allege that the harm to Jiang was being overcharged for a misbranded

United States District Court
Northern District of California

product that they did not want.  See SAC ¶ 57 (alleging, in section titled "Plaintiffs were misled and harmed by Olly's misleading labelling," "They did not want to take more than 6 mg of melatonin from the product, due to increased concerns about side effects and safety. . . . They would not have purchased the product if they knew that Olly Melatonin was inaccurately labelled and unreasonably overdosed.  In fact, knowing the truth, the product is worthless to them.").  This is sufficient under New York law.  See Rodriguez v. Hanesbrands Inc., No. 17-cv-1612 (DLI), 2018 WL 2078116, at *5 (E.D.N.Y. Feb. 20, 2018) (holding that plaintiff adequately alleged injury by alleging that as a result of defendant's misrepresentations, plaintiff did not receive the "product that defendant led them to believe they were buying," which "did not actually possess the qualities warranted by Defendant," and which therefore "had considerably less value than was warranted.") (internal quotation marks omitted).

Moreover, Olly's argument misconstrues Plaintiffs' allegations.  Plaintiffs allege that Jiang "wanted to purchase a product where two servings would be 6 mg (and no more)."  SAC ¶ 57 (emphasis added).  Plaintiffs' testing showed that each gummy in Jiang's purchased bottle had 2.47 mg in it (instead of the claimed 1.5 mg), and that a serving was 2 gummies.  See id. at 41, id. at 41 n.16.  Accordingly, an actual serving of Jiang's purchased bottle was 4.94 (2.47 x 2), instead of the claimed 3.0.  Two servings was therefore 9.88 (4.94 x 2), instead of the 6.0 they wanted.  Olly is incorrect to suggest that Jiang got what they wanted.

Accordingly, the Court does not dismiss the New York consumer protection claims.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS the motion to dismiss only as to the unpurchased products, and DENIES it in all other respects.  Plaintiffs may amend their complaint as to the unpurchased products, if they wish to do so, within thirty days of this

//

//

//

order.

**IT IS SO ORDERED.**

Dated: January 17, 2023



CHARLES R. BREYER
United States District Judge