Jonas B. Jacobson (Cal. Bar No. 269912)
jonas@dovel.com
Simon Franzini (Cal. Bar No. 287631)
simon@dovel.com
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Hope Murphy, Carol Lesh, Emily Jiang, Michele Bacus, and Damany Browne, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>vs.<br><br>Olly Public Benefit Corporation,<br><br>*Defendant.* | Case No. 3:22-cv-03760-CRB<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**Table of Contents**

I.      Introduction. ................................................................................................................. 1

II.      Parties. ...................................................................................................................... 2

III.      Jurisdiction, venue, and divisional assignment. .................................................... 2

IV.      Facts. ........................................................................................................................ 3

       A.      It is important to consumers that over-the-counter melatonin is accurately dosed and labelled. .............................................................................. 3

       B.      The FDA does not allow melatonin to be excessively overdosed. ................ 5

       C.      Scientific research reveals serious problems with the accuracy of melatonin dosing and labelling in Canada.  Scientists warn that the same is likely true of some U.S. brands. ................................................................ 6

       D.      Olly sells over-the-counter melatonin supplements to millions of U.S. consumers.  Each label claims to have a specific amount of melatonin per serving. ........................................................................................................ 7

       E.      Scientific testing reveals that, unlike other manufacturers, Accused Olly Melatonin has an unreasonable excess of melatonin. ................................. 9

       F.      Olly's labelling is false and misleading to reasonable consumers. .............. 12

       G.      The Accused Olly Melatonin products. ....................................................... 14

       H.      Olly overcharges millions of consumers. ..................................................... 15

       I.      Plaintiffs were misled and harmed by Olly's misleading labelling. ............. 15

       J.      Plaintiffs have standing to seek an injunction. ............................................ 18

       K.      Plaintiffs have no adequate remedy at law. ................................................. 19

V.      Class action allegations. .......................................................................................... 20

VI.      Claims. ..................................................................................................................... 22

       Count 1: Violations of State Consumer Protection Acts ........................................ 22

       Count 2: Violation of California's Unfair Competition Law (UCL) ...................... 23

       Count 3: Violation of California's False Advertising Law (FAL) ........................... 24

       Count 4: Violation of the California Consumers Legal Remedies Act (CLRA) ..................... 25

       Count 5: Violation of New York Gen. Bus. Law § 349 .......................................... 26

       Count 6: Violation of New York Gen. Bus. Law § 350 .......................................... 27

       Count 7: Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2) ..................................................................................................... 28

       Count 8: Breach of Express Warranty ..................................................................... 28

       Count 9: Unjust Enrichment/Quasi-Contract .......................................................... 29

VII.      Jury Demand. .......................................................................................................... 30

VIII.      Prayer for Relief. ................................................................................................... 30

**I.     Introduction.**

1.      Melatonin is a neurohormone that regulates the brain's sleep cycle.  Millions of consumers take over-the-counter melatonin supplements to help them sleep.  Because melatonin alters brain chemistry, it is important that these supplements are accurately dosed and labelled.

2.      A few years ago, scientists tested Canadian melatonin supplements and found that, for a number of brands, the true amount of melatonin varied wildly from the label.  Scientists and the National Institutes of Health have warned that the same may be true here in the U.S.

3.      Olly is a major U.S. brand of melatonin supplements.  Its supplements are sold nationwide at retailers like Walmart, Whole Foods, and Target.

4.      Each Olly bottle claims to have a specific dose of melatonin per serving.  For example:



5.      Like millions of other consumers, Plaintiffs bought Olly melatonin and trusted the accuracy of Olly's dosing and labelling.

6.      To determine how much melatonin is really in Olly, a university mass-spectrometry laboratory tested multiple bottles of Olly, including Plaintiffs' bottles. The results were alarming. The true amount of melatonin in Plaintiffs' bottles was 165% to 274% of the amount claimed.  All tested bottles had far more melatonin than the amount on the label (and far more melatonin than the "reasonable excess" permitted by the FDA).

7.      Olly systematically misrepresents how much melatonin is in the supplements it sells. Consumers are being misled, overcharged, and put at risk.

**II.      Parties.**

8.      Plaintiff Hope Murphy is domiciled in Vista, California.  She purchased a bottle of Olly Sleep in California.

9.      Plaintiff Carol Lesh is domiciled in Berkeley, California.  She purchased a bottle of Olly Sleep Extra Strength in California.

10.      Plaintiff Emily Jiang is domiciled in Manhattan, New York.  They purchased a bottle of Olly Sleep in New York. [1]

11.      Plaintiff Michele Bacus is domiciled in Chicago, Illinois. She purchased Olly Kids and Olly Sleep in Illinois.

12.      Plaintiff Damany Browne is domiciled in Brooklyn, New York.  He purchased Olly Immunity Sleep, Olly Sleep, and Olly Sleep Extra Strength in New York.

13.      The proposed class includes citizens of every state.

14.      Defendant Olly Public Benefit Corporation is a Delaware corporation with its principal place of business in San Francisco, California.

**III.      Jurisdiction, venue, and divisional assignment.**

15.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2).  The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and the matter is a class action in which one or more members of the proposed class are citizens of a state different from Olly.

16.      The Court has personal jurisdiction over Olly because (among other reasons) its principal place of business is in California.

17.      Venue is proper under 28 U.S.C. § 1391(b)(1) because Olly resides in this District, at its San Francisco headquarters.

18.      <u>Divisional Assignment</u>.  This case should be assigned to the San Francisco or Oakland division.  *See* L.R. 3-2(d).  A substantial part of the events giving rise to the claims occurred in San Francisco, at Olly's headquarters.

---

[1] Emily Jiang's pronouns are they/them.

1    **IV.    Facts.**

2        **A.    It is important to consumers that over-the-counter melatonin is accurately dosed**

3            **and labelled.**

4        19.    Melatonin (N-acetyl-5-methoxytryptamine) is a neurohormone produced by the pineal

5    gland in the brain.  It regulates the brain's circadian rhythm and sleep cycle.



*The chemical structure of melatonin*

13        20.    Millions of U.S. consumers take melatonin supplements to treat sleep problems,

14    anxiety, and other issues.  Melatonin is one of the most popular over-the-counter supplements in the

15    U.S.  Its use has "significantly increased" in the last 20 years. [2]  Using melatonin to help children fall

16    asleep is becoming increasingly popular too. [3]

17        21.    As scientists explained in the Journal of Clinical Sleep Medicine, because melatonin is

18    "self-prescribed" (i.e., purchased directly by consumers who are not experts), it is particularly

19    "important that labels are informative and representative of the product," i.e., that the "label claim

20    values for the active ingredient are accurate." [4]

21        22.    In particular, it is important to consumers that melatonin is not excessively dosed,

22    compared to what is represented on the label.  The likelihood of side effects from melatonin increases

23    with the dosage.  Side effects of melatonin include headaches, dizziness, nausea, or excessive or

24

25    _____

26    [2] JAMA Research Letter, *Trends in Use of Melatonin Supplements Among US Adults*, 1999-2018, 327(5) JAMA 483 (2022).

27    [3] The New York Times, *Parents Are Relying on Melatonin to Help Their Kids Sleep. Should They?*, https://www.nytimes.com/2020/05/18/parenting/melatonin-sleep-kids.html

28    [4] Erland, L. & Saxena, P., *Melatonin Natural Health Products and supplements: Presence of serotonin and significant variability of melatonin content*, 13 Journal of Clinical Sleep Medicine 275–281 (2017).

unwanted sleepiness. [5]  As the Texas Health hospital network explains, a "lower dose" will reduce the risk of "side effects" and thus "using the lowest effective dose will give you the best outcomes while keeping any undesirable side effects at bay." [6] And as another major manufacturer of melatonin supplements states: "The likelihood of these side effects [headaches, upset stomach, grogginess, sleeplessness, irritability and dizziness] increases with the dosage." [7] This is why "[m]any experts recommend starting with the smallest available dosage — 0.5 milligrams to 1 milligram." [8]

23.     When melatonin is falsely labelled, consumers unwittingly take "higher doses" that increase the risk of "unpleasant/unexpected side effects." [9]  And regardless of side effects, consumers don't want to unwittingly take excessive amounts of a neurohormone that alters brain chemistry. Consumers deserve the right to make an informed choice about how much melatonin they are really taking.

24.     In addition, it is important to consumers that melatonin is accurately (not excessively) dosed because the long-term safety of melatonin is not established, and higher doses carry greater long-term safety concerns. As the National Institutes of Health explains, the long-term safety of melatonin remains unknown:

> For melatonin supplements, particularly at doses higher than what the body normally produces, there's not enough information yet about possible side effects to have a clear picture of overall safety. Short-term use of melatonin supplements appears to be safe for most people, but information on the long-term safety of supplementing with melatonin is lacking. [10]

---

[5] NIH National Library of Medicine Medline Plus, *Melatonin*, https://medlineplus.gov/druginfo/natural/940.html
[6] https://www.texashealth.org/areyouawellbeing/Health-and-Well-Being/Is-It-Safe-to-Take-Melatonin-Every-Night
[7] https://www.zzzquil.com/en-us/faq/zzzquil-pure-zzzs-melatonin-faq (made by Proctor & Gamble)
[8] The New York Times, *Melatonin Isn't a Sleeping Pill. Here's How to Use It*, https://www.nytimes.com/2022/01/11/well/mind/melatonin-sleep-insomnia.html
[9] Grigg-Damberger, M. & Ianakieva, D., Poor quality control of over-the-counter melatonin: What they say is often not what you get, 13 Journal of Clinical Sleep Medicine 163–165 (2017).
[10] https://www.nccih.nih.gov/health/melatonin-what-you-need-to-know

25.     Melatonin is available on the market in a range of doses, e.g., 1 mg, 3 mg, 5 mg or 10 mg.  This is because consumers want to make their own, informed decision about the dosage that is right for them.  No consumer wants this choice to be robbed from them by inaccurate labelling and dosing.  For example, if a consumer purchases a 3 mg dose (and not a higher dose), this is because they want 3 mg and no more. This choice is objectively reflected by their decision to purchase 3 mg, instead of a higher dose. This consumer does not want to be tricked into taking, for example, 6 mg, when they thought they were purchasing and taking 3 mg.

26.     To be sure, a different consumer may choose and purchase a higher dose (for example 5 mg). But that is the point: because melatonin is a neurohormone and higher doses come with higher risks and greater safety concerns, each consumer has the right to make their own, informed choice about what dosage to purchase and take.  No reasonable consumer wants to be tricked into taking a higher dose than they wanted.

**B.     The FDA does not allow melatonin to be excessively overdosed.**

27.     The FDA recognizes that consumers have a right to make an informed decision about how much of supplements, like melatonin, they are really taking.  The FDA also recognizes that some supplements, such as melatonin, degrade over time, such that a product that contains a certain amount of a supplement when it is put on the shelves might have less of that supplement at expiration.

28.     The FDA balanced these competing considerations by providing that, for dietary supplements "reasonable excesses over labeled amounts are acceptable within current good manufacturing practice," 21 C.F.R §101.36(f)(1), i.e., within amounts reasonably necessary to ensure that the product "meets the amount specified on the label throughout the product's shelf life." Current Good Manufacturing Practice in Manufacturing, Packaging, Labeling, or Holding Operations for Dietary Supplements, 72 Fed. Reg. 34752, 34884 (June 25, 2007). But, as the FDA provides, manufacturers are prohibited from adding "unspecified amounts [of an ingredient] that would be in excess of the amount actually needed to meet the label declaration." 68 Fed. Reg. 12158, 12158 (Mar. 13, 2003).  So, an excess is not a "reasonable excess" (and violates FDA regulations) if the excess is materially in excess of the amount actually needed to meet the amount declared on the label throughout the product's shelf life.

29.     The FDA does not review and approve any particular amount of overage for dietary supplements—the duty falls on manufacturers to assure compliance with the "reasonable excess" limit.

30.     Certain U.S. manufacturers comply with the FDA's limits.  For context, Plaintiffs' testing has shown that melatonin by other U.S. manufacturers who do not unreasonably overdose their products is put on shelves with an excess amounting to approximately 10-15% more than the amount declared on the label.  This excess is reasonable because, by the time the shelf life ends, the product has approximately the amount of melatonin that is declared on the label. In this situation, the excess is not materially in excess of the amount actually needed to meet the label declaration, and so it complies with the FDA's mandates.

31.     By contrast, if a manufacturer includes materially more melatonin than is actually needed to ensure that by the time the shelf life ends, the product has approximately the amount of melatonin that is declared on the label, this violates FDA's mandates.  Because such an excess is more than the amount actually needed to meet the label declaration, it is not a "reasonable" excess.  It is therefore not permitted under the FDA regulations (and is instead prohibited).

**C.      Scientific research reveals serious problems with the accuracy of melatonin dosing and labelling in Canada.  Scientists warn that the same is likely true of some U.S. brands.**

32.     In 2017, a study of Canadian melatonin brands found "high variability, ranging from −83% to +478%, of the labelled concentration of melatonin content in melatonin supplements." [11] Some brands had reasonable excesses that were within 10% of the listed amount. But for over 70% of the tested brands, the true amount of melatonin varied more than 10% from the listed amount.  The amount of melatonin also varied highly between different lots (manufacturing batches) of the same product.  The researchers concluded that "manufacturers require increased controls to ensure melatonin supplements" are accurately labelled.

---

[11] Lauren, *Melatonin Natural Health Products and supplements*, 13 Journal of Clinical Sleep Medicine at 276.

33.     U.S. scientists warned that this Canadian study "herald[s] what may also be true in OTC melatonin supplements marketed in the United States." [12]  Likewise, the National Institutes of Health has warned that "some melatonin supplements may not contain what's listed on the product label." [13]  And Consumer Reports warned: "The findings … offer the latest proof of something supplement industry critics have long warned about: When it comes to this poorly regulated corner of modern medicine, consumers often don't know what they're buying." [14]

**D.     Olly sells over-the-counter melatonin supplements to millions of U.S. consumers. Each label claims to have a specific amount of melatonin per serving.**

34.     Olly is a major U.S. brand of melatonin supplements.  Its melatonin products are available nationwide at retailers like Walmart, Target, and Whole Foods.  Millions of U.S. consumers buy Olly Melatonin and rely on the accuracy of its labelling.

35.     Olly makes and sells several varieties of melatonin that, as explained below, are inaccurately labelled ("Accused Olly Melatonin").  For each product, the label claims a specific amount of melatonin per serving, e.g., 1 mg, 3 mg or 5 mg, on the back label.  Example products are shown below, and all accused products are identified in Section G and Exhibit 1.

---

[12] Grigg-Damberger, *Poor quality control of over-the-counter melatonin*, 13 Journal of Clinical Sleep Medicine at 163.

[13] NIH National Center for Complementary and Integrative Health, *Melatonin: What You Need To Know*,  https://www.nccih.nih.gov/health/melatonin-what-you-need-to-know

[14] Consumer Reports, *New Study Questions Ingredient Levels in Some Melatonin Supplements*, https://www.consumerreports.org/melatonin/study-questions-ingredient-levels-some-melatonin-supplements/

1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17
18
19
20
21



22   36.   These claims on the back of the product are substantially similar for all Accused Olly

23   Melatonin.  They all advertise "melatonin" as a key, active ingredient to help with sleep, and claim to

24   have a specific amount of melatonin per serving.  *See* Exhibit 1.

25   37.   Also, for some products (like the one purchased by Plaintiff Lesh), Olly displays the

26   claimed amount of melatonin on the front of the packaging (in addition to the back).  For example:

27
28



| | | |
|---|---|---|
| L-Theanine | 100 mg | ** |
| Melatonin | 5 mg | ** |
| Chamomile Extract (flower) | 17 mg | ** |
| Passionflower Extract (aerial parts) | 17 mg | ** |
| Lemon Balm Extract (aerial parts) | 16 mg | ** |

38.     These front-facing representations (e.g., of "5 mg") are substantially similar for all Accused Olly Melatonin products that have them (identified in Exhibit 1).

39.      Each Plaintiff and each class member were presented with the materially-identical representation on the back of all products, and, where identified, the materially-identical representation on the front of the products.

40.     By selling a "melatonin" supplement for sleep (i.e., a supplement that alters brain chemistry), Olly is representing to consumers that its products are accurately dosed and labelled. When a consumer picks up a bottle of Olly melatonin, they reasonably expect that it has the dosage for which Olly designed the recommended serving.  No reasonable consumer expects that a melatonin supplement has an unreasonable excess of melatonin, compared to what it claims to have. And specifically, when a bottle of Olly says it has a particular amount of melatonin per serving (e.g., 3 mg), consumers expect this to be accurate (and not unreasonably excessive).

**E.     Scientific testing reveals that, unlike other manufacturers, Accused Olly Melatonin has an unreasonable excess of melatonin.**

41.     Liquid Chromatography-Mass Spectrometry analysis (LC-MS) can accurately measure the true amount of melatonin in an over-the-counter supplement.  LC-MS is a reliable and appropriate analytical procedure for measuring melatonin content.

1    42.    For Accused Olly Melatonin, a university mass-spectrometry laboratory used LC-MS

2  to test Olly Melatonin (including Plaintiffs' bottles), among other brands.  The lab tested both non-

3  expired bottles and expired bottles, from different manufacturing lots (batches).

4    43.    If Accused Olly Melatonin were reasonably dosed, the amount of melatonin at the end

5  of the shelf life (when the bottle expires) would be materially the same as the claim on the label, i.e.,

6  close to 100% of the claimed amount.  In contrast, if Olly has an unreasonable excess of melatonin,

7  even after a bottle expires (i.e., its shelf life is over) there will be materially more melatonin than the

8  amount specified on the label.  The test results, summarized on the next page, confirm that Accused

9  Olly Melatonin has an unreasonable excess of melatonin.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| Olly type [15] | Claimed melatonin (mg / gummy)[16] | True melatonin (mg / gummy)[17] | True melatonin (%)[18] |
|---|---|---|---|
| **Non-expired bottles** | | | |
| Sleep gummy (Blackberry) (Murphy) Lot: 1300M5735 Exp: 2/2023 Tested: 5/2022 | 1.50 | 4.11 | +274% |
| Sleep gummy (Blackberry) (Jiang) Lot: 1295M9300 Exp: 3/2023 Tested: 5/2022 | 1.50 | 2.47 | +165% |
| Immunity Sleep gummy Lot: 1284M9209 Exp: 3/2023 Tested: 3/2022 | 1.50 | 2.48 | +165% |
| Sleep Extra Strength gummy (Lesh) Lot: 1246D5716 Exp: 1/2023 Tested: 4/2022 | 2.50 | 4.77 | +190% |
| Sleep gummy (Strawberry) Lot: 2266M3171 Exp: 9/2023 Tested:1/2023 | 1.50 | 2.30 | +153% |
| **Expired bottles** | | | |
| Sleep gummy (Blackberry) Lot: 1031155 Exp: 07/2022 Tested: 08/2022 | 1.50 | 2.00 | +133% |
| Muscle Recovery Sleep gummy Lot: 1158M 1098 Exp: 10/2022 Tested: 9/2022 | 1.50 | 2.28 | +152% |
| Kid's Sleep gummy Lot: 1144M 1106 Exp: 10/2022 Tested: 9/2022 | 0.50 | 0.63 | +125% |

---

[15] "Lot" is the lot number printed on bottle.  "Exp" is the expiration date printed on bottle. "Tested" is the month the lab conducted the test.

[16] The serving size for each bottle is 2 gummies/serving.  Accordingly, the per-gummy claimed amount of melatonin is half the per-serving claimed amount.

[17] The lab tested three gummies per bottle and averaged the results. There was little variance in the melatonin content between gummies in the same bottle.

[18] The percentage ratio of the true dose to the claimed dose.

44.     These results show that the melatonin content of non-expired Olly is far higher than the claimed dosages. For example, the Olly Sleep gummies that were tested had nearly three times the amount of melatonin listed on the label, and the Olly Extra Strength gummies had nearly twice the amount of listed melatonin.  Unsurprisingly, once those gummies expire, there is still far too much melatonin, compared to the amount claimed on the label.[19]  Because the excess is materially more than reasonably necessary to ensure that the melatonin meets the amount specified on the product label throughout the product's shelf life, Accused Olly Melatonin is unreasonably overdosed.

45.     Olly's own data will confirm that Olly's accused melatonin products have an unreasonable excess of melatonin.  Supplement manufacturers are required to test the dietary supplements they sell for compliance with the FDA's regulations.  That testing must be performed using a random 12-sample composite method.  21 C.F.R. § 101.9(g)(2) (describing this method). Manufacturers like Olly must retain the data from these tests.  As shown above, in Plaintiffs' testing, *all* of the Olly samples were substantially overdosed.  This was true across lots, within and across product types, and across expiration dates. Accordingly, it is reasonable to infer that Olly's own testing (using FDA protocols) will confirm that the accused products are substantially (and unreasonably) overdosed.[20]

**F.     Olly's labelling is false and misleading to reasonable consumers.**

46.     As detailed above, each Accused Olly Melatonin label claims to have a specific amount of melatonin per serving. But in truth, the dosing is unreasonably excessive.  In this way, Olly's affirmative representations are misleading to reasonable consumers.

47.     For each type of Accused Olly Melatonin, the label is false in the same way.  As illustrated above (and shown in Exhibit 1), each label claims to have a specific amount of melatonin. And for each type of Accused Olly Melatonin, the true amount of melatonin is unreasonably excessive, compared to the claimed amount.

---

[19] The expired bottles were tested either after the expiration month, or the week before the expiration month.

[20] At this early stage, Olly's own testing is uniquely within its own possession.

48.     For the injury alleged here, what matters is the accuracy of the claimed melatonin dosage. And in this respect, all Accused Olly Melatonin is substantially the same: it is all unreasonably overdosed. This is addressed in more detail below, in Section G.

49.     As detailed above, the inaccurate dosing and labelling of Accused Olly Melatonin is material to reasonable consumers. Consumers need melatonin supplements to be accurately dosed and labelled, so that consumers can make an informed choice about what dosage to buy and ingest. No reasonable consumer wants to unwittingly buy and ingest a supplement containing an unreasonable excess of melatonin, compared to what they wanted to ingest.

50.     Olly itself recognizes that accurate dosing and labelling is important to its consumers. Olly's website claims that its products are "ensured with quality and safety," and that "every product is made to meet our formulators specifications for identity, purity and potency to ensure they meet what their label claims." [21]   The point is not that all consumes read the website—the point is that Olly itself admits that accurate dosing and labelling is material to reasonable consumers.  Olly make this claim because it recognizes that consumers want this to be true, i.e., consumers demand products that are accurately labelled and dosed.  But for Olly's products, this is not true.

51.     In addition, bottles of Olly state: "We do not recommend exceeding the amount noted on every bottle's Suggested Use.  Each product was formulated by nutritional experts to deliver an effective dose of active ingredients that address daily needs and promote optimum health." [22]   Olly recognizes that a consumer who chooses to purchase say, a 5 mg bottle of melatonin (and thus selects that particular tradeoff between dosage and risk), should not be unwittingly ingesting, say, nearly twice that amount.  But due to Olly's inaccurate labelling and excessive dosing, Olly's consumers are unwittingly doing what Olly recommends against.

52.     As described above, Olly claims that it actively monitors the "potency" of "every product."  And it is customary for manufacturers to test the potency of over-the-counter supplements

---

[21] https://www.olly.com/pages/inside-the-product
[22] https://help.olly.com/hc/en-us/articles/360035074332-Can-I-take-more-than-the-recommended-dose-

1   like melatonin, before they are sold.  Therefore, Olly reasonably should have known that the potency

2   of Accused Olly Melatonin is unreasonably excessive, compared to its labels. [23]

3       53.     To be clear, while Olly's unreasonably excessive dosing violates the FDC Act,

4   Plaintiffs are not seeking to enforce the FDC Act itself (i.e., Plaintiffs are not suing merely because

5   the conduct violates the Act).  Olly's false and misleading labelling (and unreasonably excessive

6   dosing) is independently illegal under state consumer protection and warranty laws. It is these state

7   laws that Plaintiffs assert.

8       54.     Nor are Plaintiffs seeking to impose disclosure requirements not required by the FDA.

9   Plaintiffs want Olly to fix its dosing so that it is reasonable (instead of unreasonably excessive) and

10   so that its labels are not misleading.  This is identical to what the FDC Act and FDA require.

11       **G.     The Accused Olly Melatonin products.**

12       55.     All Accused Olly Melatonin products are gummies (not tablets, liquids, or soft gels).

13   The accused gummies fall into three dosage buckets (per 2 gummies): (1) Sleep Extra Strength (5

14   mg); (2) Sleep, Immunity Sleep, and Muscle Recovery Sleep (3 mg); and (3) Kids Sleep (1 mg).

15       56.     As shown above, Plaintiffs tested every type of product that they are accusing (from

16   every dosage bucket). This testing confirms that the accused products are unreasonably overdosed.

17       57.     Sleep Extra Strength was purchased by Carol Lesh and Damany Browne; Sleep was

18   purchased by Emily Jiang, Hope Murphy, Damany Browne, and Michele Bacus[24] ; Immunity Sleep

19   was purchased by Damany Browne; and Sleep Kids was purchased by Michele Bacus.

20       58.     Plaintiffs purchased every variety of gummy they are accusing, except one: Muscle

21   Recovery Sleep. Muscle Recovery Sleep, however, is substantially-similar to the 3 mg Sleep

22   gummies that Plaintiffs bought (Sleep and Immunity Sleep). All claim to have 3 mg of melatonin and

23   make the claim in the same way. See Ex. 1. They have materially-identical gummy compositions:



*Sleep*                                    *Muscle Recovery Sleep*

---

[23] At this stage, Plaintiffs are not alleging intentional deception or fraud, but reserve the right to amend if discovery reveals evidence of Olly's fraudulent intent.

[24] Mr. Browne purchased Sleep Strawberry. Emily Jiang, Hope Murphy, and Michele Bacus purchased Sleep Blackberry.

59.     To be sure, Muscle Recovery Sleep has vitamin D and cherry extract (in addition to melatonin.) But these ingredients do not materially affect the melatonin content or degradation rate. Plaintiffs know this because they tested Muscle Recovery, and it was similarly overdosed compared to Sleep and Immunity (both 3 mg gummy products that do not have vitamin D or cherry extract).

60.     Accordingly, Plaintiffs have standing for the accused products.

**H.     Olly overcharges millions of consumers.**

61.     Olly's false and misleading labelling drives the demand for Accused Olly Melatonin. As explained above, consumers demand melatonin that is accurately dosed and labelled.  This is recognized by scientists, Consumer Reports, and Olly itself.  If consumers knew the truth—that its dosing and labelling was seriously inaccurate—the price of its products would crater.  For example, on the Target website, a bottle of Olly Sleep gummies costs $12.89.  If consumers knew the truth—that this bottle was inaccurately labelled and unreasonably overdosed—Olly could not sell it for anything close to $12.89 (or even sell it at all).  For example, a reasonable consumer who wanted to buy a product with 3 mg of melatonin would not buy an unreasonably overdosed and inaccurately labelled product, and would instead buy a reasonably dosed and accurately labelled product. Plaintiffs and each class member paid a substantial price premium driven by Olly's false and misleading labelling.

62.     In fact, without accurate dosing and labelling, Accused Olly Melatonin is worthless. What reasonable consumer wants to buy a supplement that alters brain chemistry, if the product is inaccurately labelled and unreasonably overdosed?  Every reasonable consumer would instead buy an accurately dosed and labelled product, so that they could trust what they are getting.  Plaintiffs and each class member paid for Accused Olly Melatonin products that are, in truth, worthless.  Thus, the full economic injury here is the entire price of the Accused Olly Melatonin that Plaintiffs and class members purchased.

**I.     Plaintiffs were misled and harmed by Olly's misleading labelling.**

63.     Like millions of other consumers, Plaintiffs bought Accused Olly Melatonin and relied on the accuracy of Olly's dosing and labelling.

64.     In or around fall 2021, Carol Lesh bought a bottle of Olly Sleep Extra Strength gummies (Lot #1246D5716) from a Whole Foods in Berkeley, California.  Because she was buying a melatonin supplement that could alter brain chemistry, she relied on the fact that Olly's dosages were well-controlled (i.e., that the actual dosage would match the recommended dosage).  She read and relied on the accuracy of the melatonin content on the label (including the claimed dosage per serving on the front and back label), when buying the product and deciding to take it.  She selected and purchased a 5 mg dose (and not a higher claimed dose) because she did not want to take more than 5 mg of melatonin from the product, due to increased concerns about side effects and safety.  In other words, she chose not to purchase a higher dose because she did not want a higher dose.  While taking the Olly product, she experienced unwanted daytime grogginess.  These effects went away when she stopped taking it.  She would not have purchased the product if she knew that the Accused Olly Melatonin was inaccurately labelled and unreasonably overdosed. In fact, knowing the truth, the product is worthless to her.

65.     In or around fall 2021, Emily Jiang bought a bottle of Olly Sleep gummies (Lot #1295M9300) from a Target in Clinton, New York. Because they were buying a melatonin supplement that could alter brain chemistry, they relied on the fact that Olly's dosages were well-controlled (i.e., that the actual dosage would match the recommended dosage). They read and relied on the accuracy of the melatonin content on the label (including the claimed dosage per serving), when buying the product and deciding to take it.  Because their psychiatrist recommended 5-6 mg (and no more) they wanted to purchase a product where two servings would be 6 mg (and no more). Specifically, for them melatonin causes abnormally intense dreaming and associated sleep disruption, which is exacerbated at higher doses. They did not want to take more than 6 mg of melatonin from the product, due to increased concerns about side effects and safety.  In other words, they chose not to purchase a higher dose because they did not want a higher dose. They would not have purchased the product if they knew that the Accused Olly Melatonin was inaccurately labelled and unreasonably overdosed. In fact, knowing the truth, the product is worthless to them.

66.     In or around March 2022, Hope Murphy purchased a bottle of Olly Sleep gummies (Lot #1300M5735) from either a Walmart or Winco in Oceanside, California.  Because she was

buying a melatonin supplement that could alter brain chemistry, she relied on the fact that Olly's dosages were well-controlled (i.e., that the actual dosage would match the recommended dosage). She read and relied on the accuracy of the melatonin content on the label (including the claimed dosage per serving), when buying the product and deciding to take it.  She selected and purchased a 3 mg dose (and not a higher claimed dose) because she did not want to take more than 3 mg of melatonin from the product, due to increased concerns about side effects and safety. In other words, she chose not to purchase a higher dose because she did not want a higher dose. She would not have purchased the product if she knew that the Accused Olly Melatonin was inaccurately labelled and unreasonably overdosed. In fact, knowing the truth, the product is worthless to her.

67. In September and October of 2022, Michele Bacus purchased Olly Kids Sleep gummies (for her child) from a Target in Illinois. In 2022, she also purchased Olly Sleep gummies (Blackberry) for herself, from a Target or Walgreens in Illinois. Because she was buying melatonin supplements that could alter brain chemistry, she relied on the fact that Olly's dosages were well-controlled (i.e., that the actual dosage would reasonably match the recommended dosage). She read and relied on the accuracy of the melatonin content on the label (including the claimed dosage per serving), when buying the product and deciding to take it or give it to her child. She selected and purchased Olly Kids for her son (and not a higher claimed dose) because she did not want to give her son more than 1 mg of melatonin (the recommended 2-gummy serving for his age), due to increased concerns about side effects and safety. She selected and purchased Olly Sleep for herself (and not a higher claimed dose) because she did not want to take more than 3 mg of melatonin from the product, due to increased concerns about side effects and safety. In other words, she chose not to purchase a higher dose because she did not want a higher dose for herself or her child. She would not have purchased the products if she knew that the Accused Olly Melatonin was inaccurately labelled and unreasonably overdosed. In fact, knowing the truth, the products are worthless to her.

68. Ms. Bacus used up her Olly melatonin before she learned that Olly's labels were misleading. So she cannot test the bottles that she purchased. But as alleged above, tests of the same type of Olly melatonin that she purchased (Olly Kids and Olly Sleep) indicate that her own bottles were inaccurately labelled and unreasonably overdosed.

69.     From 2020 to the fall of 2022, Damany Browne purchased Olly Immunity Sleep and Olly Sleep Strawberry (both for his daughter), and Olly Extra Strength (for himself), from Walmart or Target in Brooklyn. Because he was buying melatonin supplements that could alter brain chemistry, he relied on the fact that Olly's dosages were well-controlled (i.e., that the actual dosage would reasonably match the recommended dosage). He read and relied on the accuracy of the melatonin content on the label (including the claimed dosage per serving), when buying the product and deciding to take it or give it to his child. He selected and purchased a 5 mg dose (Extra Strength) for himself (and not a higher claimed dose) because he did not want to take more than 5 mg of melatonin from the product, due to increased concerns about side effects and safety. Similarly, he selected and purchased a 3 mg dose (Immunity and Sleep) for his daughter (and not a higher claimed dose) because he did not want to give his daughter more than 3 mg of melatonin, due to the same side effect and safety concerns. In other words, he chose not to purchase a higher dose because he did not want a higher dose for himself or his child. He would not have purchased the products if he knew that the Accused Olly Melatonin was inaccurately labelled and unreasonably overdosed. In fact, knowing the truth, the products are worthless to him.

70.     Mr. Browne used up his Olly melatonin before he learned that Olly's labels were misleading. So he cannot test the bottles that he purchased. But as alleged above, tests of the same type of Olly melatonin that he purchased (Immunity Sleep, Sleep, and Extra Strength Sleep) reflect that his own bottles were inaccurately labelled and unreasonably overdosed.

**J.     Plaintiffs have standing to seek an injunction.**

71.     Plaintiffs want Olly to fix its manufacturing practices and sell its melatonin products with accurate dosing and labelling.  If Olly fixes its products, so that they are accurately dosed and labelled, Plaintiffs intend to buy them and would buy them again.  But given Olly's past deception, Plaintiffs cannot rely on Olly's word alone that it has fixed the problem.  Plaintiffs face an imminent threat of harm because they will not be able to rely on Olly's labels in the future, and will not be able to buy Accused Olly Melatonin, even if Olly claims to have fixed the issue.  To buy Olly products again, Plaintiffs need the Court to enter an order forbidding Olly from selling its melatonin unless it has fixed the dosing and labelling problem.  With that Court order in hand, Plaintiffs could and would

buy Accused Olly Melatonin again.  And with that order in hand, millions of other consumers will be

protected from being deceived like Plaintiffs were deceived.

**K.     Plaintiffs have no adequate remedy at law.**

72.     As described above, Plaintiffs suffer an actual and imminent threat of future harm that

cannot be cured with monetary damages.  For this harm, Plaintiffs lack an adequate remedy at law

and require injunctive relief.

73.     Plaintiffs also seek damages and, in the alternative, equitable restitution.  Plaintiffs

seek restitution in the alternative because they have no adequate remedy at law.

74.     A legal remedy is not adequate if it is not as certain as an equitable remedy.  To obtain

a full refund as damages, Plaintiffs must show that the products they received have essentially no

market value.  In contrast, Plaintiffs can seek restitution without making this showing.  This is

because Plaintiffs purchased products that they would not otherwise have purchased, but for Olly's

misrepresentations.  Obtaining a full refund at law is less certain than obtaining a refund in equity.

75.     Also, winning damages under the CLRA requires additional showings not required

under the UCL and FAL.  For example, to obtain damages under the CLRA, Plaintiffs must prove

that they complied with the CLRA's notice requirement.  This is significant, because here Olly

contests Plaintiffs' compliance with CLRA notice requirements.  No such requirements exist to

obtain restitution under the UCL.  In addition, the CLRA prohibits only particular categories of

deceptive conduct.  By contrast, the UCL broadly prohibits "unfair" conduct and is thus broader.

Also, Plaintiffs UCL "unlawful" prong claims incorporate Olly's violation of the California Sherman

Act.  This particular theory is not available for Plaintiffs' legal claims and, in material respects, is

easier to prove. In addition, the statute of limitations is longer for Plaintiffs' UCL claims (4 years),

compared to the statute of limitations for damages under the CLRA (3 years).

76.     By the same token, Plaintiffs' common law claims require additional showings,

compared to their UCL, FAL, or unjust enrichment claims.  For example, to prevail on their breach of

warranty claim, Plaintiffs need to show that the statements they challenge constitute a warranty and

that the warranty was part of the basis of the bargain.  No such showings are required by the UCL or

FAL, or for an unjust enrichment theory.  In fact, the UCL and the FAL were enacted specifically to

create new claims and remedies not available at common law.  And unjust enrichment exists in part

because contractual claims are often more difficult to establish.  In this way, Plaintiffs' UCL and

FAL claims, and Plaintiffs' unjust enrichment claims, are more certain than their legal claims.

77.     Finally, the remedies at law available to Plaintiffs are not equally prompt or otherwise

efficient.  The need to schedule a jury trial may result in delay.  And a jury trial will take longer, and

be more expensive, than a bench trial.

**V.     Class action allegations.**

78.     Plaintiffs bring their claims individually and on behalf of the following class and

subclasses:

| Class or Subclass Name | Definition | Class representative(s) |
| --- | --- | --- |
| Nationwide Class | All persons who purchased Accused Olly Melatonin in the United States during the applicable statute of limitations. | All Plaintiffs |
| Multi-State Consumer Protection Subclass | All persons who purchased Accused Olly Melatonin in the identified states (*see* Count 1) during the applicable statute of limitations. | All Plaintiffs |
| California Subclass | All persons who purchased Accused Olly Melatonin in California during the applicable statute of limitations. | Carol Lesh and Hope Murphy (CA) |
| New York Subclass | All persons who purchased Accused Olly Melatonin in New York during the applicable statute of limitations. | Emily Jiang and Damany Browne (NY) |
| Illinois Subclass | All persons who purchased Accused Olly Melatonin in Illinois during the applicable statute of limitations. | Michele Bacus (IL) |

79.     The following people are excluded from the class and the subclasses: (1) any Judge or

Magistrate Judge presiding over this action and the members of their family; (2) Defendant,

Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or

its parents have a controlling interest and their current employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel, and their experts and consultants; and (6) the legal representatives, successors, and assignees of any excluded persons.

***Numerosity***

80.     The proposed class contains members so numerous that separate joinder of each member of the class is impractical. There are millions of proposed class members.

***Commonality***

81.     There are questions of law and fact common to the proposed class.  Common questions of law and fact include, without limitation:

- Whether Accused Olly Melatonin products are reasonably dosed and accurately labelled;
- Whether Olly's labelling is misleading to reasonable consumers;
- Whether Olly violated state consumer protection laws;
- The monetary relief needed to reasonably compensate Plaintiffs and the proposed class;
- The injunctive relief needed to prevent future harm to Plaintiffs and the proposed class.

***Typicality***

82.     Plaintiffs' claims are typical of the proposed class.  Like the proposed class, Plaintiffs purchased Accused Olly Melatonin.

***Predominance and Superiority***

83.     The prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent or varying adjudication with respect to individual members, which would establish incompatible standards for the parties opposing the class. For example, individual adjudication would create a risk that Accused Olly Melatonin labelling is found to be misleading for some consumers, but not other similarly-situated consumers.

84.     Common questions of law and fact predominate over any questions affecting only individual members of the proposed class. These common legal and factual questions arise from central issues which do not vary from class member to class member, and which may be determined

without reference to the individual circumstances of any particular class member. For example, a core liability question is common: whether Olly's labelling is misleading to reasonable consumers.

85. A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical.  It would be unduly burdensome to separately litigate millions of individual claims.

### *Classwide injunctive relief*

86.  Olly has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole.

## VI.    Claims.

### Count 1: Violations of State Consumer Protection Acts

### (on behalf of all Plaintiffs and the Multi-State Consumer Protection Subclass)

87. Plaintiffs incorporate each and every factual allegation set forth above.

88. As alleged below, Plaintiffs bring individual and subclass claims based on California law.  For the Multi-State Consumer Protection Subclass, Plaintiffs bring this count for violations of state consumer protection laws that are materially-similar to the laws of California, including:

| State | Statute |
|-------|---------|
| California | Cal. Bus. & Prof. Code § 17200, and the following; *Id.* §17500, and the following; Cal. Civ. Code §1750 and the following. |
| Connecticut | Conn. Gen Stat. Ann. § 42- 110, and the following. |
| Illinois | 815 ILCS § 501/1, and the following. |
| Maryland | Md. Code Ann. Com. Law, § 13-301, and the following. |
| Missouri | Mo. Rev. Stat. § 407, and the following. |
| New York | N.Y. Gen. Bus. Law § 349, and the following. |

89. Each of these statutes is materially similar.  Each broadly prohibits deceptive conduct in connection with the sale of goods to consumers.  No state requires individualized reliance, or proof

1   of defendant's knowledge or intent.  Instead, it is sufficient that the deceptive conduct is misleading

2   to reasonable consumers and that the conduct proximately caused harm.

3       90.     As alleged in detail above, Olly's misrepresentations are misleading to reasonable

4   consumers in a material way.  Olly's false and misleading labelling was a substantial factor in

5   Plaintiffs' purchase decisions and the purchase decisions of class members.

6       91.     Plaintiffs and class members were injured as a direct and proximate result of Olly's

7   conduct because: (a) they would not have purchased Accused Olly Melatonin if they had known that

8   the Olly products are inaccurately labelled and unreasonably overdosed; (b) they overpaid for the

9   products because the products are sold at a price premium due to Olly's misleading labelling; or (c)

10  they received products that were, in truth, worthless.

### Count 2: Violation of California's Unfair Competition Law (UCL)

### (on behalf of Plaintiffs Murphy and Lesh and the California Subclass)

13      92.     Plaintiffs incorporate each and every factual allegation set forth above.

14      93.     Plaintiffs bring this cause of action individually and on behalf of the California

15  Subclass.

16      94.     Plaintiffs and the Subclass purchased Accused Olly Melatonin Products in California.

17      95.     Olly has violated California's Unfair Competition Law (UCL) by engaging in

18  unlawful, fraudulent, and unfair conduct (i.e., violating each of the three prongs of the UCL).

***The Unlawful Prong***

20      96.     Olly engaged in unlawful conduct by violating the FAL and CLRA, as alleged below

21  and incorporated here.

22      97.     In addition, Olly engaged in unlawful conduct by violating California Health & Safety

23  Code § 109875 et seq. (the Sherman Food Drug and Cosmetic Law) which adopts and parallels federal

24  FDCA requirements, including prohibitions on false and misleading labelling.

***The Fraudulent Prong***

26      98.     As alleged in detail above, Olly's labelling is false and misleading.  Its labelling is

27  likely to deceive, and did deceive, Plaintiffs and other reasonable consumers.

28

Third Amended Complaint                23                No. 3:22-cv-03760-CRB

*The Unfair Prong*

99.     Olly's conduct, as detailed above, also violated the "unfair" prong of the UCL.

100.     Olly's conduct caused substantial injury to Plaintiffs and subclass members.  The harm to Plaintiffs and the subclass greatly outweighs the public utility of Defendant's conduct (which is none).  Inaccurately dosed and labelled melatonin supplements have no public utility.  This injury was not outweighed by any countervailing benefits to consumers or competition.  Misleading labels only injure healthy competition and harm consumers.

101.     Plaintiffs and the class could not have reasonably avoided this injury.  As alleged above, Olly's misrepresentations were deceptive to reasonable consumers.

102.     Defendant's conduct, as alleged above, was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers

103.     Defendant's conduct violated the public policy against false and misleading labels, which is tethered to the CLRA and FAL, as well as California's Sherman Act.

*     *     *

104.     For all prongs, Plaintiffs saw, read and reasonably relied on Olly's misrepresentations when purchasing Accused Olly Melatonin.  Classwide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy Accused Olly Melatonin.

105.     Olly's misrepresentations were a substantial factor in Plaintiffs' purchase decisions and the purchase decisions of class members.

106.     Plaintiffs and class members were injured as a direct and proximate result of Olly's conduct because: (a) they would not have purchased Accused Olly Melatonin if they had known that the Olly products are inaccurately labelled and unreasonably overdosed; (b) they overpaid for the products because the products are sold at a price premium due to Olly's misleading labelling; or (c) they received products that were, in truth, worthless.

## Count 3: Violation of California's False Advertising Law (FAL)

### (on behalf of Plaintiffs Murphy and Lesh and the California Subclass)

107.     Plaintiffs incorporate each and every factual allegation set forth above.

108.     Plaintiffs bring this cause of action individually and on behalf of the California Subclass.

109.     Plaintiffs and the Subclass purchased Accused Olly Melatonin Products in California.

110.     As alleged in detail above, Olly falsely advertised its products by falsely representing that Accused Olly Melatonin is accurately dosed and labelled.

111.     Defendant's misrepresentations were likely to deceive, and did deceive, Plaintiffs and other reasonable consumers.  Defendant should have known through the exercise of reasonable care that these statements were false and misleading.

112.     Plaintiffs saw, read and reasonably relied on Olly's misrepresentations when purchasing Accused Olly Melatonin.  Classwide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy the products.

113.     Defendant's misrepresentations were a substantial factor in Plaintiffs' purchase decisions and the purchase decisions of subclass members.

114.     Plaintiffs and class members were injured as a direct and proximate result of Olly's conduct because: (a) they would not have purchased Accused Olly Melatonin if they had known that the Olly products are inaccurately labelled and unreasonably overdosed; (b) they overpaid for the products because the products are sold at a price premium due to Olly's misleading labelling; or (c) they received products that were, in truth, worthless.

### Count 4: Violation of the California Consumers Legal Remedies Act (CLRA)
#### (on behalf of Plaintiffs Murphy and Lesh and the California Subclass)

115.     Plaintiffs incorporate each and every factual allegation set forth above.

116.     Plaintiffs bring this cause of action individually and on behalf of the California Subclass.

117.     Plaintiffs and the Subclass purchased Accused Olly Melatonin Products in California.

118.     As alleged in detail above, Olly has violated the CLRA by falsely representing that Accused Olly Melatonin is accurately dosed and labelled.  As a result of engaging in such conduct, Defendant has violated California Civil Code § 1770(a)(5), (a)(7), and (a)(9).

119.    Defendant's misrepresentations were likely to deceive, and did deceive, Plaintiffs and reasonable consumers.  Olly should have known through the exercise of reasonable care that these statements were false and misleading.

120.    Plaintiffs saw, read and reasonably relied on Defendant's misrepresentations when purchasing the products.  Classwide reliance can be inferred because Olly's misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy the products.

121.    Defendant's misrepresentations were a substantial factor and proximate cause in causing damages and losses to Plaintiffs and class members.

122.    Plaintiffs and class members were injured as a direct and proximate result of Olly's conduct because: (a) they would not have purchased Accused Olly Melatonin if they had known that the Olly products are inaccurately labelled and unreasonably overdosed; (b) they overpaid for the products because the products are sold at a price premium due to Olly's misleading labelling; or (c) they received products that were, in truth, worthless.

123.    CLRA § 1782 NOTICE.  On June 27, 2022, Plaintiffs Murphy and Lesh sent a CLRA demand letter to Olly's San Francisco headquarters and its California registered agent, via certified mail (return receipt requested).  This letter provided notice of the particular violations alleged here and demanded that Defendant correct the problem.  Defendant did not respond.  Accordingly, these Plaintiffs seek all monetary and equitable relief available under the CLRA, including reasonable attorney fees.

124.    Plaintiffs previously filed CLRA venue declarations.  Dkt. 17-3 and 17-4.

**Count 5: Violation of New York Gen. Bus. Law § 349**

**(on behalf of Plaintiffs Jiang and Browne and the New York Subclass)**

125.    Plaintiffs incorporate each and every factual allegation set forth above.

126.    Plaintiffs bring this cause of action individually and for the New York Subclass, seeking statutory damages available under New York Gen. Bus. Law § 349 (among other relief).

127.    Plaintiffs and the Subclass purchased Accused Olly Melatonin Products in New York.

128.   Olly's labelling is consumer-oriented and its misleading labelling has a broad impact on consumers at large, i.e., the multitude of New Yorkers that purchase Accused Olly Melatonin.

129.   As alleged in detail above, Olly's misrepresentations are likely to mislead reasonable consumers acting reasonably under the circumstances.  These misrepresentations were material (and important) to consumers and drove their choice to purchase Accused Olly Melatonin.

130.   Plaintiffs and class members were injured as a direct and proximate result of Olly's conduct because: (a) they would not have purchased Accused Olly Melatonin if they had known that the Olly products are inaccurately labelled and unreasonably overdosed; (b) they overpaid for the products because the products are sold at a price premium due to Olly's misleading labelling; or (c) they received products that were, in truth, worthless.

131.   Plaintiffs and the Subclass seek statutory damages of $50, treble damages, an injunction, reasonable attorney fees, and all other available relief.  See N.Y. Gen. Bus. Law § 349 (h).

### Count 6: Violation of New York Gen. Bus. Law § 350

**(on behalf of Plaintiffs Jiang and Browne and the New York Subclass)**

132.   Plaintiffs incorporate each and every factual allegation set forth above.

133.   Plaintiffs bring this cause of action individually and for the New York Subclass, seeking statutory damages available under New York Gen. Bus. Law § 350 (among other relief).

134.   Plaintiffs and the subclass purchased Accused Olly Melatonin Products in New York.

135.   Olly's labelling is consumer-oriented and its misleading labelling has a broad impact on consumers at large, i.e., the multitude of New Yorkers that purchase Accused Olly Melatonin.

136.   As alleged in detail above, Olly's misrepresentations are likely to mislead reasonable consumers acting reasonably under the circumstances.  These misrepresentations were material (and important) to consumers and drove their choice to purchase Accused Olly Melatonin.

137.   Plaintiffs and class members were injured as a direct and proximate result of Olly's conduct because: (a) they would not have purchased Accused Olly Melatonin if they had known that the Olly products are inaccurately labelled and unreasonably overdosed; (b) they overpaid for the products because the products are sold at a price premium due to Olly's misleading labelling; or (c) they received products that were, in truth, worthless.

138.     Plaintiffs and the Subclass seek statutory damages of $500, treble damages, an injunction, reasonable attorney fees, and all other available relief.  See N.Y. Gen. Bus. Law § 350-e (3).

**Count 7: Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2)**

**(on behalf of Plaintiff Bacus and the Illinois Subclass)**

139.     Plaintiff incorporates by reference each and every factual allegation set forth above.

140.     Plaintiff brings this cause of action individually and for the Illinois Subclass.

141.     Plaintiff and the Subclass purchased Accused Olly Melatonin products in Illinois.

142.     Defendant's false and misleading labelling had the capacity to deceive a substantial portion of the public into believing that Accused Olly Melatonin is reasonably dosed and accurately labelled.

143.     Defendant's unreasonable dosing and inaccurate labelling were material.  As alleged in detail above, this false and misleading labelling was important to consumers and affected their choice to purchase Accused Olly Melatonin.

144.     Defendant labelled the products this way because it intended consumers to rely on the labels and to believe that the products were reasonably dosed and accurately labelled.

145.     Defendant's misrepresentations occurred in the conduct of trade or commerce affecting the people of the State of Illinois.

146.     Plaintiff and class members were injured as a direct and proximate result of Olly's conduct because: (a) they would not have purchased Accused Olly Melatonin if they had known that the Olly products are inaccurately labelled and unreasonably overdosed; (b) they overpaid for the products because the products are sold at a price premium due to Olly's misleading labelling; or (c) they received products that were, in truth, worthless.

**Count 8: Breach of Express Warranty**

**(on behalf of Plaintiffs and the California, New York, and Illinois Subclasses)**

147.     Plaintiffs incorporate by reference each and every factual allegation set forth above.

148.     Plaintiffs bring this count individually.  In addition, Plaintiffs Murphy and Lesh bring this claim on behalf of the California Subclass; Plaintiffs Jiang and Browne bring this claim on behalf of the New York Subclass; and Plaintiff Bacus brings this claim on behalf of the Illinois Subclass.

149.    Olly, as the designer and manufacturer of Olly Melatonin, issued material, written warranties by representing that the Accused Olly Melatonin had a particular amount of melatonin per serving.  This was an affirmation of fact about the products (i.e., a description of the ingredients) and a promise relating to the goods.

150.    This warranty was part of the basis of the bargain and Plaintiffs relied on this warranty.

151.    Accused Olly Melatonin does not conform to this warranty because, as alleged in detail above, Olly's labelling is inaccurate and its dosing is unreasonably excessive.  Thus, the warranty was breached.

152.    Shortly after they discovered that Accused Olly Melatonin was inaccurately labelled, Plaintiff Jiang provided pre-suit notice of their breach of warranty claim, sent to Olly's San Francisco headquarters and its California registered agent, on July 7, 2022.  Olly did not respond.

153.    Shortly after they discovered that Accused Olly Melatonin was inaccurately labelled, Plaintiffs Browne and Bacus provided pre-suit notice of their breach of warranty claims, sent to Olly's counsel of record in this case and Olly's headquarters, on February 9, 2022. Olly did not respond.

154.    Plaintiffs and Subclass members were injured as a direct and proximate result of Olly's breach because: (a) they would not have purchased Accused Olly Melatonin if they had known that Olly's warranty was false; (b) they overpaid for the products because the products are sold at a price premium due to Olly's false warranty; or (c) they received products that were, in truth, worthless.

### Count 9: Unjust Enrichment/Quasi-Contract

**(on behalf of all Plaintiffs and the Nationwide Class, or alternatively on behalf of the California, New York, and Illinois Subclasses)**

155.    Plaintiffs incorporate each and every factual allegation set forth above.

156.    Plaintiffs bring this count individually and for the Nationwide Class.

157.    As alleged in detail above, Olly's false and misleading labelling caused Plaintiffs and the Class to purchase Accused Olly Melatonin and overpay for it.

158.    In this way, Olly received a direct and unjust benefit, at the expense of Plaintiffs and the Class.

159.    Plaintiffs and the Class seek the equitable return of this unjust benefit.

**VII.    Jury Demand.**

160.    Plaintiffs demand a jury trial on all issues so triable.

**VIII.    Prayer for Relief.**

161.    Plaintiffs seek the following relief individually and for the proposed class and subclasses:

- An order certifying the asserted claims, or issues raised, as a class action;
- A judgment in favor of Plaintiffs and the proposed class;
- Damages, including statutory damages, as available by law;
- Restitution, disgorgement, and other just equitable relief;
- An injunction;
- Attorney fees, as available by law;
- Pre- and post-judgment interest;
- Any additional relief that the Court deems reasonable and just.

Dated: February 16, 2023                Respectfully submitted,

By: */s/ Jonas Jacobson*

Jonas B. Jacobson (Cal. Bar No. 269912)
jonas@dovel.com
Simon Franzini (Cal. Bar No. 287631)
simon@dovel.com
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: (310) 656-7069

*Counsel for Plaintiffs*

EXHIBIT 1













3











